John E. BROCCOLI

v.

John MORAN.

No. 95–345–C.A..

Supreme Court of Rhode Island.

July 29, 1997.

Constance H. Pannone, for Plaintiff.

Annie Goldberg, Aaron Weisman, Asst. Attorneys General, for Defendant.

Before WEISBERGER, C.J., and LEDERBERG, BOURCIER and FLANDERS, JJ.

## OPINION

BOURCIER, Justice.

John E. Broccoli (Broccoli), a convicted conspirator and robber, appeals from the denial of his application for postconviction relief following a hearing thereon by a trial justice in the Superior Court. We deny his appeal and affirm the judgment denying his application.

## I

### Case Travel

On February 6, 1985, Gasbarro's liquor store (Gasbarro's) on Atwells Avenue in Providence was robbed by armed and masked gunmen. Broccoli, along with Lawrence Mastrofine (Mastrofine), was later arrested for and charged with conspiring to commit as well as committing that robbery. Both were later tried before a jury in the Superior Court and found guilty. On appeal to this Court their convictions were affirmed and their appeals denied. *State v. Mastrofine,* 551 A.2d 1174 (R.I.1988).

Some months thereafter, Peter Gilbert (Gilbert), who had been a participant along with Broccoli and Mastrofine in the Gasbarro robbery and who had testified as a state's prosecution witness against them at their Superior Court jury trial, died unexpectedly in Connecticut while en route to a skydiving lesson at an airport in that state. The Connecticut police, in the course of examining the vehicle in which Gilbert had died, found a quantity of cocaine. Gilbert's death in Connecticut, along with the cocaine found in his vehicle, served to trigger extensive news-media attention and publicity as well as investigations by public and police officials in the City of Providence. The reason for all that interest was that Gilbert, at the time of his death and for some many months prior,

had been living in protected-witness custody of the Providence police department. Several investigations undertaken both by the local news media and by local city officials revealed and exposed instances of certain detention practices of Gilbert by his police custodians that could justifiably be described as both sloppy and careless and liberties that could be interpreted as favorable and in fact generously preferential. Broccoli, upon learning what Gilbert's unexpected death had unearthed, convinced himself that if his trial jury had known of the preferential treatment given to Gilbert by his police custodians, it would not have found him guilty of the Gasbarro robbery.

This Court has twice recently, in appeals involving a different defendant, considered what probable effect the posttrial disclosures and revelations concerning the nature and substance of Gilbert's police-custody amenities might have had upon a trial jury's determination of Gilbert's credibility as a state prosecution witness. *Mastracchio v. Moran,* 698 A.2d 706 (R.I.1997); *State v. Mastracchio,* 605 A.2d 489 (R.I.1992). We determined in those instances that it was highly unlikely that such later discovered facts that came to light after Gilbert's death would have had any effect upon the trial jury's credibility assessment of his trial testimony and most certainly would not have in any manner undermined confidence in the trial jury's verdict. Notwithstanding those previous holdings, because the assertion before us is that the state's failure to inform Broccoli's counsel of all the details concerning Gilbert's police-custody confinement violated Broccoli's due process rights, our review of the Superior Court's judgment denying his application for postconviction relief involves mixed questions of law and fact that have an impact upon constitutional matters and consequently require our de novo review of his post-conviction-hearing record in this case.

## II

### Case Facts

In late January 1985, Broccoli approached a longtime friend, Steven DiPaolo (DiPaolo),

with a plan to rob Gasbarro's liquor store where DiPaolo, a cousin of the store owner, Lombard Gasbarro (Lombard), was employed as a clerk. Broccoli at that time was in need of money as was DiPaolo, who was finding it difficult to support his cocaine habit on a store clerk's salary. DiPaolo was initially reluctant to participate in the robbery, but because he was heavily indebted to his cocaine suppliers, he agreed to do so. DiPaolo's role in the robbery was to serve as the inside man and advise the others when it would be most advantageous to implement the robbery and to provide details of the store's operation and the place the store receipts would be kept.

Soon after DiPaolo agreed to participate in the robbery, Gilbert, Broccoli, DiPaolo, and Mastrofine, the four primary robbery participants, met at Squire Auto Body in Providence, where Broccoli was employed, in order to plan out the details of the robbery. DiPaolo told the others present at that meeting that Wednesday mornings were generally slow for business at the liquor store and would therefore be the best time to rob it. DiPaolo knew that on Wednesday mornings chances were good that no one else would be in the store other than himself and his cousin Lombard, the owner of the store. DiPaolo also suggested that committing the robbery on a Wednesday would reduce the chances of having customers present in the store who might be injured or become witnesses. DiPaolo described to his confederates the location in the liquor store where Lombard kept the store sale proceeds and also told them that they could expect to find between $5,000 and $20,000 there.[1] The robbery was initially scheduled for the last Wednesday in January[2] but was suddenly postponed at the last moment to February 6, 1985, because on the day before the originally scheduled robbery date, DiPaolo told Broccoli that he had made a large bank deposit of store money, leaving little to be taken in the store. Broccoli, after learning this fact from DiPaolo, rescheduled the robbery for February 6.

During the early cold and snowy morning hours of February 6, 1985, Gilbert met with Kenneth Silva (Silva) and Silva's girlfriend. The three of them then drove to East Providence where they were to meet with Mastrofine and a girl with whom Mastrofine had shared a hotel room the previous night. When they arrived, Gilbert became upset upon learning that Mastrofine and Broccoli had not, as planned, stolen a car to be used in the robbery. Gilbert was also upset because he, in addition, learned that a Cadillac car that he had planned on driving back to Providence from East Providence that morning had been stopped the previous day by the East Providence police while Mastrofine was driving it. Because Mastrofine, when the car was stopped, had identified himself as Silva and Silva's driver's license was found to have expired, the police told Mastrofine that he could not drive the Cadillac and must leave it where parked. The police then offered to and did drive Mastrofine and his female companion from the location where the Cadillac was left parked to the hotel where Mastrofine and his companion were staying.

After an extensive search at Mastrofine's hotel for the keys to the parked Cadillac proved successful, Gilbert then left Mastrofine's hotel room in East Providence along with Silva and his girlfriend and drove to the place where the Cadillac had been left by Mastrofine. When they arrived there, Gilbert left Silva's car, got into the Cadillac, and drove it back to the hotel where Mastrofine was staying to pick up Mastrofine and his female friend, and they then drove to Providence to meet with Broccoli. Meanwhile, Silva and his girlfriend returned to their home where their assigned task was to monitor a police radio in preparation for the liquor-store robbery.

Gilbert, Mastrofine, and Mastrofine's companion all drove in the Cadillac to a Dunkin Donuts store in Olneyville Square where they met Broccoli, as per prearranged plan. Broccoli was at first upset because Gilbert

1. Gilbert testified that he was told there would be more like $40,000 there.

2. Before committing the robbery of Gasbarro's liquor store, Gilbert allegedly first requested per-

mission from Gelardo Mastracchio (Mastracchio), the person who had the authority to grant approval of any crimes taking place on Federal Hill. That approval was granted.

was late, and Broccoli thought Mastrofine and Gilbert had canceled the robbery without telling him. After Gilbert and Mastrofine assured Broccoli that the reason they were late was the problem concerning the Cadillac, Broccoli settled down and was pleased that the robbery was still scheduled. Mastrofine then asked Broccoli to drive his female friend to her home on nearby Atwells Avenue in Providence. Broccoli agreed and did so. Mastrofine and Gilbert then left together in the Cadillac, with Mastrofine driving. They went to Gilbert's house where they picked up weapons and other assorted robbery paraphernalia. After putting those items into the Cadillac, Mastrofine and Gilbert then drove to Squire Auto Body to pick up Broccoli, who had returned there after driving Mastrofine's female friend to her home.

When they arrived at Squire Auto Body, Broccoli took over the driving of the Cadillac, Mastrofine sat in the front passenger seat, and Gilbert sat in the rear passenger seat. The trio then set out for Gasbarro's liquor store to do there what would eventually bring them here.

When they arrived at Gasbarro's liquor store, a liquor delivery truck making a delivery happened to be parked in front of the store. Concluding that it was not then a good time to commit the planned robbery, Mastrofine, Broccoli, and Gilbert decided to park and wait on a side street across from the liquor store's parking lot, from which location they could continuously reconnoiter the situation. Over the course of an hour, the group continued to observe the activities outside the store. They then moved from their surveillance location and drove around the immediate area a few times. Finally, Gilbert exited the Cadillac and stood on the corner opposite the liquor store. At that point, DiPaolo, who had come out of the store to help unload items from the parked delivery truck, saw Gilbert and signaled Gilbert away by shaking his head from side to side. Gilbert, despite DiPaolo's warning signal, remained on the corner until DiPaolo came out of the store again, some five minutes later. Again, DiPaolo shook his head from side to side. Confused about whether DiPaolo was signaling to indicate that the robbery was

being called off or whether the timing for it was just bad, Gilbert then returned to the Cadillac and told Broccoli what had transpired. Broccoli then went to a public telephone located at a Mr. Donut shop on Atwells Avenue not far from Gasbarro's and telephoned DiPaolo to find out what he was trying to indicate to Gilbert by shaking his head. When Broccoli returned, he told Gilbert and Mastrofine that DiPaolo told him that the delivery truck that was then being unloaded would soon be leaving and that a second beer delivery truck would then make another delivery. That second delivery, DiPaolo said, would take about thirty minutes, after which would be a good time to rob the liquor store. Knowing that it would be about thirty to forty minutes before the robbery could be carried out, the group then decided to go to nearby Caserta's pizza restaurant and indulge their appetites. They ordered food to take out, and when the food was prepared, they left Caserta's and returned to the Cadillac where they sat and ate. After they finished eating, they returned to the liquor store, where they observed a beer truck being unloaded, as DiPaolo had predicted. When the delivery was completed, the truck left and Gilbert and Mastrofine then entered the liquor store. Broccoli's role at this time was to remain in the Cadillac to keep watch and listen to a police scanner. He had a shotgun with him for protection in the event something unexpected developed.

Mastrofine entered the store first, with a scarf and hat covering most of his face and head. He asked Lombard, who was working at the store with DiPaolo, if he could use the telephone to call a taxicab. Gilbert came into the store soon afterward. Gilbert then observed Mastrofine as he went to the telephone and pretended that he was calling someone. Unfortunately for Mastrofine, as he was at the telephone, the scarf covering his face suddenly came down, exposing his face to Lombard. When Lombard began reacting as if he were suspicious of Mastrofine, Gilbert took out his pistol, went over to Lombard, told him he was going to rob the store, and put a gun to Lombard's side. Mastrofine put down the telephone when he saw Gilbert go over to Lombard. Gilbert then directed Lombard to the area DiPaolo

had described as the location of the office door. After Lombard failed to convince Gilbert that the door was locked and that he did not know where the keys were, Gilbert told Lombard to try the door anyway, which he did. The door opened easily, and Gilbert then pushed Lombard into the office and told him to sit at his desk, located near a bookcase. Gilbert then handcuffed Lombard to the bookcase.

Gilbert proceeded to rifle through the drawers in Lombard's office desk in an attempt to find the money DiPaolo had predicted would be there. Although the money was not in the drawer where DiPaolo had said it would be, Gilbert eventually found some money, which he proceeded to stuff into a large black silk bag, emblazoned with a Playboy emblem, that Gilbert had earlier put in his coat to use during the robbery.

Meanwhile, as Gilbert was plundering Lombard's office, Mastrofine told DiPaolo to get the money out of the store cash register and put it into a paper bag. DiPaolo did as he was told, and when he returned Mastrofine then handcuffed him to a pipe under the sink located in the store's bathroom. After DiPaolo was safely attached to the pipe, Mastrofine then turned off the bathroom lights and closed the door behind him.

Mastrofine then proceeded into Lombard's office and asked Lombard for the keys to the store. Gilbert told Mastrofine to leave the office. Mastrofine then grabbed the keys to the liquor store from Lombard's desk and left. Almost immediately after Mastrofine left, Gilbert heard a gunshot. Mastrofine then muttered something about shooting himself. Gilbert immediately grabbed the silk bag he had filled with money and stuffed it into his jacket. As he did so, he saw Mastrofine rushing out of the store and Gilbert had to catch up with him. Gilbert then ordered Mastrofine to calm down and to remove his scarf so that they could walk out of the store looking casual and not attract any attention.

Just as Gilbert and Mastrofine left the store, Lombard managed to break the bookcase and free himself. He then went into the bathroom and broke the sink pipe to which DiPaolo had been handcuffed and set DiPao-

lo free. Both DiPaolo and Lombard were then still handcuffed. Just then a customer happened to telephone the store on the one phone line that had not been cut by Mastrofine and Gilbert and Lombard quickly told him about the robbery and asked the caller to notify the police. A second customer happened to come into the store almost immediately thereafter and he was able to remove the handcuffs from Lombard and DiPaolo with bolt cutters that he conveniently happened to have in his car.

In the meantime, while Mastrofine and Gilbert were casually walking away from the robbery scene, hoping to make a clean getaway and to enjoy the fruits of their fumbling efforts, they saw a police vehicle coming toward them. They had to then suddenly abandon their original getaway plan, which had been to steal and drive away in Lombard's car after the robbery, because Mastrofine, after having accidentally shot himself, had unfortunately become flustered and had inadvertently thrown Lombard's store keys, including Lombard's car key, into a snowbank as he left the store. Gilbert, thinking quickly, concluded that the next best alternate course of action was for him and Mastrofine to cross Atwells Avenue in front of the approaching police vehicle and go to the other side of Atwells Avenue from which point they could then safely escape down a side street. Gilbert's new plan was suddenly thwarted, however, by Broccoli, who although having been warned to keep the Cadillac concealed so that its vanity license plate, displaying a distinctive Tattoo 1 registration, would not be noticed, apparently sensed something had gone awry and drove out in front of Mastrofine and Gilbert as they were beginning to cross Atwells Avenue. Mastrofine jumped into the car as it passed, but Gilbert kept on walking and then quickly ran down a side street, as he had planned. He hid behind the first house that he found to have a shoveled driveway because, as he later said, he wanted to avoid leaving any footprints. Broccoli, Mastrofine, and the Cadillac, meanwhile, became stranded and anchored in a snow bank on Federal Hill and the Cadillac, as a result, had to be abandoned in the snow bank. Mastrofine and Broccoli,

in their haste, managed to leave in it a .25–caliber automatic gun in a holster, a temporary plate, a twelve-gauge shotgun wrapped in a white towel, a hammer and screwdriver, and a box from Caserta's containing still warm uneaten "pigs in a blanket." Most certainly, there was no sign of either a rabbit's foot or a horseshoe in the unlucky Cadillac.

Gilbert in the meantime had successfully eluded the police and was able to obtain transportation from a man to whom he had previously sold drugs. That man drove Gilbert to Squire Auto Body, to which Broccoli had fled. Broccoli told Gilbert that Mastrofine had only collected a bag full of store receipts in the robbery and that there was no money in Mastrofine's bag. Gilbert also told Broccoli that he did not get any money. Gilbert then left the auto body shop and returned to his home. Mastrofine later that afternoon came to Gilbert's house at about 4 p.m. He told Gilbert that he had taken money and not just receipts as Broccoli had said. Mastrofine and Gilbert, then suspecting that Broccoli was holding out on them, decided to split the loot from the robbery among themselves and Silva and to eliminate Broccoli altogether from the division of the robbery proceeds. They decided to give Silva $1,000—$500 each from Mastrofine and Gilbert.[3] Mastrofine and Gilbert each realized $2,850. Silva, Mastrofine, Gilbert, DiPaolo, and Broccoli were all eventually arrested on charges related to the Gasbarro liquor store robbery. Gilbert and DiPaolo decided after their arrests to turn state's evidence, and both later testified for the prosecution at the Gasbarro liquor store jury trial.

### III

### Standard of Review

■ Postconviction relief is available to any person in this state pursuant to G.L.1956 chapter 9.1 of title 10 who, after conviction for a crime committed, claims *"inter alia,* that the conviction violated [his or her] constitutional rights or that newly discovered

facts require vacation of the conviction in the interest of justice." *Palmigiano v. State,* 120 R.I. 402, 404, 387 A.2d 1382, 1384 (1978). Following a postconviction hearing, a trial justice's factual findings are entitled to great weight and will not be disturbed on appeal absent a showing that the trial justice misconceived or overlooked material evidence or was otherwise clearly wrong. *Doyle v. State,* 430 A.2d 416 (R.I.1981).

■ Since in this appeal the primary issue raised by Broccoli's application for postconviction relief is whether the state's failure to inform Broccoli or his counsel of all the details of the custodial confinement of Gilbert violated Broccoli's due process rights, review of the judgment entered on Broccoli's application for postconviction relief involves mixed questions of law and fact that have an impact on constitutional matters. Accordingly, as noted earlier, we will review the record de novo. As we said in *State v. Campbell,* 691 A.2d 564, 569 (R.I.1997),

"'[a] policy of sweeping deference' [to the trial justice] could allow constitutional issues to be decided '"[i]n the absence of any significant difference in the facts," * * *[depending] "on whether different trial judges draw general conclusions that the facts are sufficient or insufficient"' to decide a constitutional issue. [*Ornelas v. United States,* 517 U.S. ——, ——, 116 S.Ct. 1657, 1662, 134 L.Ed.2d 911, 919 (1996)]. The Supreme Court concluded that '[i]ndependent review is therefore necessary if appellate courts are to maintain control of, and to clarify the legal principles.' *Id.*"

After conducting our de novo review of the evidence in the record before us, we conclude that the evidence presented at the hearing on Broccoli's application for postconviction relief and asserted to be newly discovered evidence sufficient to warrant a new trial was merely impeaching and cumulative evidence and was completely immaterial to Broccoli's guilt or innocence. The trial justice committed no

---

**3.** Gilbert held back $215 from the $500 he was supposed to give Silva because Silva owed him money.

error in denying Broccoli's application for postconviction relief.

## IV

### The Alleged Newly Discovered Evidence

As we said in *Mastracchio*, op. at 713:

" 'When addressing an application for postconviction relief, the trial justice applies the standard used for awarding a new trial. * * * This standard involves the application of a two-part test. To satisfy the first part, the threshold test, the trial justice must determine (1) if the newly discovered evidence actually is newly discovered or available only since the trial, (2) if the petitioner was diligent in attempting to discover the evidence for use at the original trial, (3) that the evidence is not merely cumulative or impeaching but is also material to the issue, and (4) that the evidence is of a kind that would probably change the verdict at a new trial.' *McMaugh v. State*, 612 A.2d 725, 731 (R.I. 1992). *See also State v. Perry*, 667 A.2d 784 (R.I.1995)."

Furthermore, we went on to discuss what constituted "material" evidence. We noted that in *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), the United States Supreme Court, pursuant to its decision in *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), said that the

"touchstone of materiality is a 'reasonable probability' of a different result * * *. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A 'reasonable probability' of a different result is accordingly shown when the Government's evidentiary suppression 'undermines confidence in the outcome of the trial.' * * * A defendant need not demonstrate that after

discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict. The possibility of an acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict. One * * * [must show] that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 434–35, 115 S.Ct. at 1566, 131 L.Ed.2d at 506 (quoting *Bagley*, 473 U.S. at 678, 105 S.Ct. at 3381, 87 L.Ed.2d at 491).

We concluded in *Mastracchio* that pursuant to decisions of the United States Supreme Court, a trial justice called upon to review the evidence on an application for postconviction relief need not determine whether there was sufficient evidence to convict absent the discounted evidence but must instead determine whether the previously undisclosed favorable evidence puts the case in such a different light as to undermine confidence in the verdict. Relying upon the analysis contained in *Mastracchio* as well as the case law discussed and reviewed herein, we conclude that the evidence presented by Broccoli concerning the police-custody-confinement amenities extended Gilbert does not so undermine confidence in the jury's verdict as to warrant a new trial.[4]

## V

### Gilbert's Alleged Perjurious Trial Testimony

Broccoli's postconviction contention that Gilbert's trial testimony was perjurious and should warrant the grant of a new trial is essentially the same contention as was advanced and previously rejected by this Court in *Mastracchio*, and we conclude that the record before us does not warrant our revisiting that contention. We reject it once again for the reasons previously set forth in *Mastracchio*.

---

4. It should be noted that at the time of the trial justice's decision, he did not have the benefit of the decision in *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). Never-

theless, he reached the correct conclusion with respect to Broccoli's application for postconviction relief.

## VI

### Bennett's Testimony

James Bennett (Bennett), a witness for the state at the Gasbarro liquor store jury trial, was one of the trial witnesses whose testimony was challenged in Broccoli's application for postconviction relief. Bennett was Broccoli's cellmate after Broccoli had been arrested and was being held awaiting trial for the robbery. Bennett testified that Broccoli told him that he had driven the ill-fated Cadillac for the robbery and that he had originally planned the robbery with a person named Steve, which coincidentally was DiPaolo's first name. In addition, Bennett testified that Broccoli had told him that Gilbert was going to testify for the state. He also testified that he had overheard Mastrofine and Broccoli talking to each other in a holding room at the Adult Correctional Institutions where all prisoners are kept before being driven and delivered to the various courts and that he had overheard Mastrofine tell Broccoli that he did not think that he could be identified because he had a scarf over his face.[5]

Defense counsel for Broccoli at his jury trial called as a rebuttal witness Donald LaMudge (LaMudge) to rebut Bennett's testimony. LaMudge testified that he saw Bennett in the prison holding room while Mastrofine and Broccoli were there. LaMudge also testified that he saw Bennett reading Broccoli's court papers while Broccoli had gone to the bathroom and that Bennett continued to read the papers even after Broccoli returned from the bathroom to the holding room. Broccoli's defense counsel also presented a second rebuttal witness, Stephen Zarbo (Zarbo), who testified that while he was imprisoned, he had observed that Bennett was sick, suffering from heroin withdrawal, and that Bennett told him that he would do anything to get out of prison in order to get more heroin.

Broccoli now asserts that because Bennett, while in protected-witness custody at the Providence police station, was extended more liberal living conditions than he would have experienced had he been in prison, which liberal conditions were not known to his counsel at the time of the Gasbarro liquor-store trial, Bennett's credibility was highly questionable and, as a result, confidence in the jury's guilty verdict has been undermined. Broccoli asserts that Bennett lied in his testimony so that he could get out of prison sooner and could finish serving out his sentence while in his more liberal police custody arrangement at the Providence police station.

Fatal to Broccoli's postconviction contention, however, is the undeniable fact that Bennett's testimony was not only exhaustively explored before the jury by defense counsel during his cross examination of Bennett but was also considered to be highly questionable by the trial justice even at the time of Broccoli's trial. In fact, the trial justice, when ruling on the motions for a new trial following the guilty verdicts that had been returned in the Gasbarro liquor-store-robbery trial, said with regard to Bennett's testimony that in passing upon those motions he could "disregard his testimony because I don't think it adds much to the case." Thus, the trial justice, even without knowing the details of Bennett's police custody arrangements, was not impressed with or even influenced by Bennett's jury-trial testimony.

Bennett's testimony, as noted by the trial justice, had been thoroughly and completely impeached at Broccoli's jury trial. No new posttrial information emanating from the later Gilbert revelations, including the information about Bennett's police custody, could serve to make Bennett's trial testimony which was already essentially worthless any less credible. Thus, any supposedly new posttrial information concerning Bennett's police custody activities was merely cumulative. Additionally, the information was in itself inherently immaterial because it did not in any manner relate to Broccoli's guilt or innocence but was just simply nothing more than cumulative and impeaching evidence. See State v. Lanoue, 117 R.I. 342, 366 A.2d

---

5. Mastrofine apparently had forgotten that the scarf covering his face had fallen during the robbery revealing his heavily bearded, pock-marked face. State v. Mastrofine, 551 A.2d 1174, 1175 (R.I.1988).

1158 (1976). Accordingly, the so-called newly discovered evidence concerning Bennett's allegedly favorable living conditions while in police custody at the Providence police station was totally insufficient to warrant Broccoli's request for a new trial. The hearing justice's decision denying Broccoli's application for postconviction relief and a new trial based on that evidence concerning Bennett's trial testimony was clearly without error.

## VII

### Gilbert's Testimony

■ The details concerning the conditions of Gilbert's police protective custody that came to light in June, 1988 some time after the Gasbarro liquor-store-robbery trial have been previously thoroughly discussed in *Mastracchio.* We do not feel that it is necessary to repeat here again those details. Suffice it to say that Gilbert was indeed provided with very liberal living conditions while in protected-witness custody with the Providence police and, in return for his trial testimony, received reduced sentences on his various then-pending criminal charges. We note, however, as we did in *Mastracchio* that none of the so-called new evidence relating to Gilbert's police-custody confinement possessed any material probative relationship to the guilt or the innocence of Broccoli. There is a complete absence of any evidence to indicate that Gilbert's liberal custody was conditioned upon his giving testimony that would result in Broccoli's conviction. The details of Gilbert's witness and plea agreement with the state, which were revealed to defense counsel prior to Broccoli's trial and which were later brought out for the trial jury's consideration during his cross-examination by defense counsel, failed to show or even indicate that Gilbert's liberal sentences were, in fact, dependent upon the success of his trial testimony for the state. No mention was ever made in Gilbert's witness and plea agreement with the state concerning the type or the manner of custody to which he would be entitled. Additionally, Gilbert was pointedly and extensively questioned on cross-

examination during Broccoli's trial about his custodial living conditions so that any further information about that matter would have been merely cumulative. In Broccoli's trial, as was the case during Gilbert's testimony in *Mastracchio,* Gilbert's extensive involvement with drugs and drug dealing as well as his prior insurance fraud, burglary, escape, and murder charges were all brought out for the jury's consideration during his cross-examination. Furthermore, Gilbert's dinner excursions, and his receipt of welfare checks and payments from the state were also explored during his cross-examination. Defense counsel also pointed out that Gilbert had previously committed perjury. Additionally, in closing arguments, defense counsel for Mastrofine, Broccoli's codefendant, consumed nine complete transcript pages attacking and discrediting Gilbert's trial testimony. Defense counsel exhaustively discussed, for the jury's consideration, the money that Gilbert had received from the state, the immunity Gilbert had received in return for his testimony, the extensive drug dealings in which Gilbert had participated, the prison escape charges Gilbert faced in Florida, the three classes of burglary charges Gilbert faced in Maine, the three murders Gilbert had committed within a few months of the liquor-store robbery, the weekly public-assistance checks that Gilbert had received, Gilbert's prior perjurious testimony given in a case in 1979, and the twenty-five to fifty times Gilbert had gone out for dinner while in police custody. Moreover, Gilbert was pointedly labeled by defense counsel as a "cold-blooded murderer" and "a dope dealer and seller." Thus, even taking into account the new posttrial information learned about Gilbert's protected-witness police custody conditions, confidence in the trial jury's verdict could not be said to have been undermined because that posttrial information was nothing more than merely impeaching and cumulative evidence and was not material to the guilt or innocence of Broccoli.

Even if we were to discount Gilbert's trial testimony in light of Broccoli's alleged newly discovered evidence,[6] there remained in the

---

**6.** We note that this is not the analysis that is required by *Kyles.* However, we undertake such

an analysis in order to show that even under a more rigorous standard, Broccoli's guilty verdict

trial record more than sufficient other trial evidence warranting Broccoli's conviction by the jury. Primarily, there was the testimony of DiPaolo, who had participated in the conspiracy as well as the robbery with Broccoli and whose testimony Broccoli did not challenge in his application for postconviction relief. Additionally, there was more than ample circumstantial evidence supporting Broccoli's conviction, such as the testimony of the police officer who saw the driver of the Cadillac pick up one person running out of the Gasbarro liquor store while another person ran off down the side street. Furthermore, the testimony of DiPaolo and the police officer who saw the Cadillac and the two people walk out of the liquor store all matched and actually corroborated Gilbert's testimony, thus contradicting Broccoli's postconviction allegations that Gilbert's testimony was all false and motivated solely by his generous police-custody amenities.

Accordingly, the hearing justice did not err in denying Broccoli's application for postconviction relief. While admittedly the posttrial revelations concerning several of Gilbert's activities while in protected-witness custodial confinement may have been titillating and certainly newsworthy for purposes of the news media, they were actually immaterial incidents that would amount to nothing more than cumulative impeaching bits of evidence to a trial jury that had already been made totally aware of Gilbert's sordid criminal history and background. Broccoli's trial jury had been repeatedly and clearly informed that Gilbert was an admitted three-time murderer, a robber, a drug dealer, a perjurer, a bigamist, and a common thief and cheat. Despite knowing all that, Broccoli's trial jury nonetheless found that what Gilbert had told them about Broccoli's participation in the planning and commission of the Gasbarro robbery was truthful. To suggest, as Broccoli does now, that had his trial jurors known that Gilbert had gone out to eat and had taken skydiving lessons while in the company of his police custodians or that he was permitted to visit with his wife and children, they would have totally rejected Gilbert's testimony is simply a wishful phantasmal withstands his application for postconviction re-

contention. The painting of another black spot or two onto a cheetah will never transform the cheetah into appearing as anything other than a cheetah, no matter how deftly the painter may have wielded his brush. We perceive that Broccoli unfortunately overlooks the painful but obvious reality that his trial jury had before it more than sufficient evidence, apart from Gilbert's testimony, from which it could legally conclude his guilt.

## VIII

### Conclusion

For all the foregoing reasons, Broccoli's appeal is denied and dismissed. The judgment appealed from is affirmed, and the papers in this case are remanded to the Superior Court.

GOLDBERG, J., did not participate.