DECISION
Before this Court is a motion for a new trial pursuant to Rule 33 of the Superior Court Rules of Criminal Procedure. Chester Briggs (the Defendant) seeks a new trial following his April 27, 2001 conviction by a Newport County Superior Court jury on the charge of first degree murder. The Defendant bases this motion on newly-discovered evidence and a violation of his due process rights. The State objects to the Defendant's motion.
 FACTS AND TRAVEL
Timothy Ayers was a sentenced inmate. On October 21, 1999, Ayers provided a witness statement to authorities concerning a fellow inmate named Charles Fuller. Ayers stated that during their joint incarceration, Fuller had confessed to him certain facts surrounding the death of Fuller's girlfriend's young son. Fuller's statements to Ayers were an attempt to explain the reason for his incarceration and the murder charge against him. Before a trial could commence, Fuller pled guilty to a charge of manslaughter. Thus, Ayers did not testify against Fuller.
On February 19, 1997, Patricia Jacques was murdered. Following an investigation, police arrested the Defendant and charged him with her murder. On April 10 and 11, 2001, at a trial by a jury sitting in Newport County Superior Court, Ayers testified that he had discussed the murder with the Defendant during the course of their joint incarceration and that the Defendant had admitted culpability. Prior to that trial, the Defendant had moved that the State be ordered to turn over certain evidence. The State did not disclose Ayers' statement concerning Fuller.[1] Additionally, the State's criminal history check of Ayers failed to reveal three of Ayers' convictions. The jury found the Defendant guilty of murder in the first degree.
The Defendant moves for a new trial, asserting that the State failed to provide (1) information concerning Ayers' statement against Fuller and (2) Ayers' full criminal history, despite his request for this information pursuant to Rule 16. The Defendant bases his motion on two theories: (1) his post trial discovery of this information constitutes newly-discovered evidence, necessitating a new trial, and (2) the suppression of this evidence violated his due process rights. The State responds, respectively, that (1) the nondisclosed information is merely cumulative and impeaching and, therefore, does not warrant a new trial, and (2) that it was under no duty to provide the Defendant with that information prior to trial.
 Motion for a New Trial Based on Newly-Discovered Evidence
Pursuant to Rule 33 of the Superior Court Rules of Criminal Procedure, a trial justice may grant a new trial if required in the interest of justice. State v. Krakue, 726 A.2d 458, 461 (R.I. 1999). To succeed on a motion for a new trial based on newly-discovered evidence, a defendant must satisfy a two-pronged test. Bleau v. Wall, 808 A.2d 637, 642 (R.I. 2002); State v. Hornoff, 760 A.2d 927, 934 (R.I. 2000). The first prong of the test is a four-part inquiry that requires that the evidence (1) be newly discovered since trial, (2) not be discoverable prior to trial with the exercise of due diligence, (3) not be merely cumulative or impeaching but rather material to the issue on which it is admissible, and (4) be of the type which would probably change the verdict at trial. Bleau, 808 A.2d at 642; Krakue, 726 A.2d at 461. Once this first prong has been satisfied, the trial judge must then determine if the evidence presented is "credible enough to warrant a new trial." Hornoff, 760 A.2d at 934 (quoting State v. Gomes, 690 A.2d 310, 321 (R.I. 1997). In determining whether the evidence is credible enough to warrant a new trial, the trial justice must exercise her independent judgment as to the credibility of the witnesses and the weight to be given their testimony. State v.Morejon, 603 A.2d 730 (R.I. 1992).
The Defendant argues that he did not discover that Ayers had made a statement against Fuller on October 21, 1999 until it was filed in Fuller's case on April 26, 2001. He claims that this evidence was not discoverable prior to trial with the exercise of due diligence because only the State and the witness were privy to Ayers' agreement to testify. The Defendant maintains that the evidence was not merely cumulative because he could have exposed for the jury's consideration that Ayers made a habit of claiming that other prisoners confessed to him and no one else. He also maintains that this evidence is material because it would have caused the jury to reject the Defendant's confession, which was the only direct evidence in the case, and the result of the proceeding would have been different. The State responds that the information discovered by the Defendant relating to Ayers' status as a witness in two other cases is cumulative and impeaching. The State argues that the Defendant failed to satisfy the first prong of the Rule 33 test because the information was cumulative and impeaching and there was a substantial amount of other evidence linking the Defendant to the murder.
In determining materiality, this Court relies on Kyles v. Whitley, in which the Supreme Court of the United States stated that the:
 "touchstone of materiality is a `reasonable probability' of a different result . . . . The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A `reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression `undermines confidence in the outcome of the trial.' . . . . A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict. The possibility of an acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict." 514 U.S. 419, 434-35 (1995) (quoting U.S. v. Bagley, 473 U.S. 667, 678 (1985); see also Bleau,
808 A.2d at 643 (stating Court's reliance on Kyles
standard of materiality).
Therefore, "[a] trial justice must `not determine whether there was sufficient evidence to convict absent the discounted evidence but must instead determine whether the previously undisclosed [or newly-discovered] favorable evidence puts the case in such a different light as to undermine confidence in the verdict.'" Bleau, 808 A.2d at 643 (quoting Broccoli v. Moran, 698 A.2d 720, 726 (R.I. 1997)). Cumulative evidence is defined as "[a]dditional or corroborative evidence to the same point. That which goes to prove what has already been established by other evidence." Black's Law Dictionary 380 (6th ed. 1990). "New evidence that is not related to defendant's guilt or innocence and serves only to destroy the credibility of the evidence merely is impeaching." Bleau, 808 A.2d at 644 (citing Mastracchio, 698 A.2d at 713).
In the present case, assuming arguendo that the evidence was both newly-discovered after trial and not discoverable before trial, the evidence still lacks materiality. Ayers' testimony was not necessary to determine the Defendant's guilt. The previously undisclosed evidence that Ayers had made a similar statement against a defendant in another matter does not undermine the jury's verdict because that evidence does not now put the case in a different light. There is no relationship between Ayers' statement in the Fuller matter and the outcome of the Defendant's trial that would undermine confidence in the jury's verdict. In addition to being immaterial to the conviction, the newly-discovered evidence is impeaching. The fact that Ayers had made a similar statement against another defendant would serve only to destroy his credibility. The testimony was offered in addition to the wealth of evidence against the Defendant. As outlined in the State's October 25, 2002 memorandum in opposition to the Defendant's motion, the State presented a substantial amount of physical and testimonial evidence with which to convict the Defendant.[2] See Krakue, 726 A.2d at 461 (finding no basis for granting a motion for a new trial in the interest of justice where the trial justice, in his independent judgment, found that adequate evidence existed to support the verdict and that the defendant's claim of newly-discovered evidence had no merit).
 Violation of Due Process in Discovery
The Defendant argues that he sought information about Ayers that could be used to impeach his credibility through motions pursuant to Rule 16 of the Rules of Criminal Procedure and for the production of exculpatory evidence but that the State never disclosed the requested information. He maintains that the State's failure to disclose Ayers' prior cooperation was an improper limitation on cross-examination that inhibited his right to impeach credibility. It is his contention that the undisclosed information could have been used to create a reasonable doubt in the mind of one or more of the jurors to avoid a conviction.
The State responds that neither the United States Supreme Court's decision in Brady v. Maryland nor Rule 16 required the State to provide the Defendant with the details of Ayers' role as a witness in the unrelated cases. The State argues that the Court must therefore look to state statutes and/or court rules to determine what discovery the Defendant is entitled to and when those rights arise. Rule 16, the State argues, does not mandate that the State inform the Defendant about any cooperation with law enforcement agencies and/or the fact that the witness may testify in unrelated cases. The State also argues that Brady
does not require it to turn over everything that the Defendant considers exculpatory. The State submits that the information the Defendant claims the State failed to provide would not have been admissible at trial nor would it have changed the trial's result.
The Supreme Court of the United States has held that the prosecution's suppression of evidence subsequent to an accused's request violates due process where the evidence is favorable to the accused and is material either to guilt or to punishment. Brady v. Maryland; State v. Wyche,518 A.2d 907 (R.I. 1986). Impeachment evidence, like exculpatory evidence, falls within the Brady rule. U.S. v. Bagley, 473 U.S. 667, 675 (1985). The Brady rule applies without regard to the good faith or bad faith of the prosecution. Cronan ex rel. State v. Cronan, 774 A.2d 866, 880 (R.I. 2001). Though the prosecution has neither a constitutional duty to routinely deliver its entire file to defense counsel, nor is it responsible for delivery of information outside its custody and control, it must disclose requested information if that information meets theBrady two-part test: the information (1) constitutes either exculpatory or impeachment evidence and (2) is material to the outcome of the case or sentencing. Wyche, 518 A.2d at 909.
The Supreme Court of the United States has also held that regardless of whether the defendant makes a general request, specific request, or no request at all, evidence is material only if there is a reasonable probability that had the evidence been disclosed to the defense, the result of the proceeding would have been different. Bagley, 473 U.S. at 682. A `reasonable probability' is a probability sufficient to undermine confidence in the outcome. Id. Rhode Island, however, has adopted a standard of materiality that provides criminal defendants even greater protection. Lerner v. Moran, 542 A.2d 1089, 1091 (R.I. 1988); Wyche,518 A.2d 907, 910 (R.I. 1986); In re Ouimette, 115 R.I. 169, 177;342 A.2d 250 (1975). In In re Ouimette, the Rhode Island Supreme Court adopted a variable standard of materiality, which is based on the degree of prosecutorial culpability. Lerner, 542 A.2d at 1091. Thus, the Brady
rule applies in three different situations: (1) the undisclosed evidence demonstrates that the prosecution's case includes perjured testimony and that the prosecution knew, or should have known, of the perjury; (2) there is a pretrial request for specific evidence that is material; and (3) there is only a general request for "Brady material." In reOuimette, 115 R.I. at 179; 342 A.2d at 254. "While defendants do not have a right to know about every prior court appearance by all government witnesses, the government should at least inform defendants of all previous occasions on which the witness testified for the government. After all, a history of cooperation with the government would tend to impeach the credibility of a government witness." U.S. v. Cole,707 F. Supp. 999, 1003 (N.D.Ill. 1989) (requiring the government to disclose all previous cases in which its witnesses testified for the government). The Rhode Island Supreme Court, however, has interpreted the scope of Rule 16, noting that "other than prior recorded statements or a summary of the witness's expected trial testimony, under Rule 16, `the only records the state is required to produce [pertaining to a prospective prosecution witness] are those regarding prior convictions.'"State v. Brown, 709 A.2d 465, 469 (R.I. 1998) (brackets in original) (quoting State v. Kelly, 554 A.2d 632, 635 (R.I. 1989)); see also Statev. Fuller, 2000 R.I. Super. LEXIS 98 (finding that despite the defendant's entreaty that the court be guided by the mandate in U.S. v.Cole concerning a witness's prior court appearances, the Rhode Island Supreme Court's interpretation of Rule 16 in State v. Brown is "clear and controlling").
The Rhode Island Supreme Court applied the variable standard of materiality in Wyche, and stated that when the failure to disclose is deliberate, the Court will not concern itself with the degree of harm caused to the defendant by the misconduct and shall simply granted a new trial. Wyche, 518 A.2d at 910. The Wyche court added that "[t]he prosecution acts deliberately when it makes `a considered decision to suppress . . . for the purpose of obstructing' or where it fails `to disclose evidence whose high value to the defense could not have escaped . . . [its] attention.'" Wyche, 518 A.2d at 910 (quoting U.S. v. Keough,391 F.2d 138, 146-47 (2d Cir. 1968)). "Evidence is not regarded as `suppressed' . . . when the defendant has access to the evidence before trial by the exercise of reasonable diligence." State v. L'Heureux,787 A.2d 1202, 1207 (R.I. 2002) (citing Cronan, 774 A.2d at 881). To overturn a conviction where the prosecution is blameless in not disclosing requested information, the defendant must persuade the court that the nondisclosed evidence possesses the requisite degree of materiality. In re Ouimette, 342 A.2d at 254 (R.I. 1975). In cases in which there is an unintentional, inadvertent suppression of evidence, the defendant must show that there is a "significant chance that the use and development of the withheld evidence by skilled counsel at trial would have produced a reasonable doubt in the minds of enough jurors to avoid a conviction." Id. at 254-55.
A request for "all Brady material" or for "anything exculpatory" "gives the prosecutor no better notice than if no request is made." U.S. v.Agurs, 427 U.S. 97, 107-108 (1976). "If there is a duty to respond to a general request of that kind, it must derive from the obviously exculpatory character of certain evidence in the hands of the prosecutor. But if the evidence is so clearly supportive of a claim of innocence that it gives the prosecution notice of a duty to produce, that duty should equally arise even if no request is made." Id. at 108. The prosecutor must decide what, if anything, he should voluntarily submit to defense counsel when only a general request has been made, or no request has been made. Id. The prosecutor, however, will not have violated his constitutional duty of disclosure unless his omission is of sufficient significance to result in the denial of the defendant's right to a fair trial. Id.
In the present case, there is nothing that suggests that the later-discovered evidence was deliberately withheld by the prosecution. Therefore, automatic reversal is not warranted. The Defendant's motion for exculpatory evidence requested "[a]ny evidence which may be used to impeach or discredit any witness the prosecution intends to call . . .," "[a]ny evidence which may be used to impeach or discredit any prospective State witness . . .," and "[a]ny evidence which provides some significant aid to the defendant's case . . . ." (Emphasis added.) In his August 9, 2001 memorandum, the Defendant characterizes these requests as "specific," and claims that he was seeking information specifically about Ayers. Memo. at 9. The language of these requests, however, is not so specific as he now claims, but can more accurately be characterized as general. Nowhere in his motion for exculpatory evidence does the Defendant specifically mention Ayers. Therefore, any duty on the part of the prosecution "must derive from the obviously exculpatory character of certain evidence in the hands of the prosecutor." See Agurs, 427 U.S. at 108. That Ayers made a statement against another defendant in another matter is not of an obviously exculpatory character to the Defendant here, nor is that evidence clearly supportive of his innocence. Though the State may have disclosed this evidence, it had no duty to do so. This nondisclosure is not so significant that it warrants a new trial. In order to obtain relief from the jury's verdict then, the Defendant must show that there would be a significant chance that the use and development of the evidence discovered post trial would have produced a reasonable doubt in the minds of enough jurors to avoid a conviction.Mastracchio, 698 A.2d at 719 (applying "significant chance" rule as announced in In re Ouimette). Even if the Defendant had used this evidence at trial, it could only have been used to impeach Ayers; it cannot be said that impeaching one witness would produce a reasonable doubt in jurors' minds while there remained a plethora of other testimonial and physical evidence against the Defendant.
 Rule 16 Nondisclosure of Three of Ayers' Prior Convictions
The Defendant also contends that the State failed to inform him of three convictions Ayers' obtained during the time between when Ayers first agreed to testify and the time of his trial testimony. The Defendant argues that this failure was a violation of Rule 16 and amounts to a Brady violation because those cases are the core of his argument that Ayers received undisclosed benefits as a result of his status as a state's witness. The Defendant asserts that the State's failure to furnish the information prejudiced him because he went to trial unprepared. The State responds that, prior to trial, it did provide the Defendant with the results of Ayers' criminal history checks in Rhode Island, Massachusetts, and the National Criminal Information Center databases. Though it acknowledges its failure to notify the Defendant of three of Ayers' convictions, the State argues that this information is cumulative and impeaching because the criminal history checks detail thirty-four "criminal contacts" for Ayers and the inclusion of three more would have little if any impact on the jury.
As stated above, under Rule 16 the only records that the State is required to produce (other than prior recorded statements or a summary of the witness's expected trial testimony) are those regarding prior convictions. State v. Brown, 709 A.2d at 469. "The trial justice is in the best position to determine whether any harm resulted from alleged noncompliance with discovery motions and whether the harm can be mitigated." State v. Mroejon, 603 A.2d 730, 735 (R.I. 1992) (citations omitted). "Upon consideration of an alleged nondisclosure, a trial justice . . . should examine four factors: (1) the reason for nondisclosure, (2) the extent of prejudice to the opposing party, (3) the feasibility of rectifying that prejudice by a continuance, and (4) any other relevant factors." Id. With respect to the first factor, where the record indicates a deliberate nondisclosure, a new trial will be granted without inquiring into the degree of harm that the misconduct caused.Id. Where the nondisclosure is inadvertent, the court moves to the second element of the test. Id. To determine whether procedural prejudice exists, the trial justice must determine whether the discovery violation prevented the defendant from properly preparing for trial. State v.Coelho, 454 A.2d 241, 245 (R.I. 1983).
In the present case, there is no evidence that the State deliberately suppressed these convictions — an action that would have automatically triggered a new trial. The three nondisclosed convictions amount to merely cumulative impeaching evidence. During direct examination, the jury immediately learned of two of Ayers' criminal convictions. The Defendant had the opportunity to cross-examine Ayers regarding these convictions, as well as other incidents within his criminal background. The jury was aware that Ayers was a convicted criminal. If the number of criminal contacts that the Defendant was made aware of prior to trial, and had the opportunity to impeach Ayers with, would not have impeached him, then the three convictions that were not listed on the criminal history check would not have done so. See Statev. Evans, 725 A.2d 283, 290 (R.I. 1999) (holding that the nondisclosure of one criminal indictment was cumulative and would not have impeached the witness where numerous other criminal offenses were made known to the jury). In addition to being cumulative, these three convictions were not material in that had they been made known to the jury, they would not have undermined the confidence in the verdict.
The State's nondisclosure of three criminal convictions, in light of the other numerous criminal contacts, is inconsequential and could not affect or prejudice the Defendant. As stated above, the Defendant had ample ammunition, provided by the information that was disclosed through the State's criminal check of Ayers, with which to damage Ayers' credibility before the jury. For whatever reason, the three convictions did not show up on the State's background check and, absent evidence of wrongdoing on the State's part, the Defendant must show that the use of those convictions would have produced a reasonable doubt in the minds of enough jurors to avoid a conviction. The Defendant has failed to do so. In light of Ayers' disclosed criminal history, the State's failure to disclose three of Ayers' convictions is not so significant that the Defendant was denied a fair trial.
 CONCLUSION
After reviewing the record and the arguments before it, this Court finds that the previously undisclosed evidence does not put the present case in such a different light as to undermine confidence in the jury's verdict. This Court discerns no significant chance that the use and development of this evidence would have produced a reasonable doubt in the minds of enough jurors to avoid a conviction. Accordingly, this Court must, and does, deny the Defendant's motion for a new trial.
[1] Subsequent to the Defendant's conviction in the present case, Ayers purportedly admitted to James Abbott, an investigator from the Public Defender's Office, that he had given the State Police a false statement relative to his information regarding Fuller's jailhouse confession. However, during his testimony in the Defendant's motion for a new trial, Ayers clarified what he meant by his statement to Mr. Abbott. The Court is satisfied that Ayers was not indicating that he gave fabricated information to the State. Rather, what he meant was that, in hindsight, given Fuller's eventual plea to a manslaughter charge, the information that Fuller told him, and which he in turn told the State Police, necessarily had to be false. Put differently, Ayers was not admitting to making a false statement, but to inadvertently delivering one. Ayers, however, has not made a similar admission with respect to the Defendant's statements to him.
[2] The State's memorandum highlights the following evidence that was presented to the jury:
 (1) According to telephone records and witnesses, the Defendant telephoned and spoke with the victim from a payphone near the victim's home minutes before her death.
 (2) A witness testified that he heard five gunshots coming from the direction of the victim's property. The medical examiner who performed an autopsy on the victim testified and corroborated the number and estimated timing of those gunshots. The witness who heard the gunshots further testified that he had observed a pickup truck operating on a road near the victim's home. The witness' description of the truck he observed matched the description of the Defendant's truck.
 (3) Though the Defendant claimed that he was at a shopping mall in Manchester, New Hampshire at the time of, and immediately following, the victim's death, the State presented evidence that the Defendant used his cellular telephone in Massachusetts at a time consistent with an automobile route from the victim's home at her time of death to the Massachusetts cell sites.
 (4) The Defendant asked two individuals to obtain a handgun for him within a few months preceding the murder. One of these individuals obtained a handgun and ammunition for the Defendant and delivered those items to him before the date of the victim's murder. Also during that time, the Defendant discussed with another individual the proper method for using such a handgun. A firearms expert confirmed that the shell casings and projectiles that the Rhode Island State Police and the Tiverton Police recovered at the murder scene, the hospital, and at the autopsy were consistent with the handgun and ammunition provided to the Defendant.
 (5) Within a few days of the victim's murder, New Hampshire State Police seized vegetation, a black plastic tie, and a pair of gloves from the Defendant's pickup truck. The vegetation found in the Defendant's truck matched samples of vegetation from the murder scene; tests on the gloves revealed the presence of gunshot residue; and the black plastic tie was identical to two black plastic ties found at the murder scene.
 (6) After being advised of his Miranda rights, the Defendant stated to investigators that he never left New Hampshire on the date of the victim's murder, having been in the area of two apartment buildings he owned from approximately 7:00 p.m. until 8:15 p.m. and then at a Manchester, NH mall from 9:00 p.m. until 10:15 p.m. Evidence presented at trial did not support these claims. One resident from each of the apartment buildings testified that he was not at their respective buildings on the evening of the murder. According to further testimony from one of these tenants, as well as yet another tenant, the Defendant attempted to solicit them to provide him with an alibi for that evening.
 (7) The State presented evidence that demonstrated a financial relationship between the Defendant and the victim, which it further used to establish a motive for the Defendant to murder her. The Defendant told police that he held money (up to between $67,000 and $80,000) for the victim and that he would periodically return it to her in installments when she requested it. On the evening before her murder, the Defendant claimed to have left in the victim's car the final installment of this money. Evidence presented at trial, however, indicated that the Defendant had a continuing financial obligation to the victim on the day of her murder. This evidence included a number of unanswered phone calls and faxes from the victim to the Defendant in the days immediately preceding the murder and testimony of the victim's heightened level of anxiety during that time. An employee of the victim testified that on the day of the murder the victim told her that she was expecting a $50,000 check in the mail from people who had recently agreed to purchase the victim's home. The realtor and the prospective home buyer testified that no further installment of money for the home purchase was owed, tending to show that the victim had attempted to keep the financial arrangement between herself and the Defendant a secret from her employee. The realtor further testified that the victim needed money for the purchase and renovation of a new home. Evidence of checks that the Defendant had bounced, as well as his own admission that banks were "on his tail," showed that the Defendant was experiencing financial difficulties also. Through evidence of the victim's aggressive pursuit of payment from the Defendant, his inability to satisfy that obligation, and the Defendant's avoidance of the victim's attempts to contact him, the State established a motive for the Defendant to murder the victim.
 (8) The Defendant told investigators that he had learned of the victim's murder from the victim's son the day after it occurred. He further told investigators that her son informed him that the victim was found at midnight, without providing additional details. The victim's son testified that on the day after the murder he did not know any of the details of his mother's death. Nonetheless, the Defendant informed another individual of the victim's murder, stating that the victim "went up to the barn at 9:30 p.m. and did not come back down." Other testimony had earlier established that the time of the murder was approximately 9:30 p.m. The Defendant, however, had claimed that his sole source of information about the murder was from someone who did not have such specific details, inferring that his unexplained knowledge of the victim's time of death was inculpatory.