Ann McMAUGH

v.

STATE.

No. 91–307–C.A.

Supreme Court of Rhode Island.

July 17, 1992.

John A. Macfayden, III, Peter DiBiase, Providence, Donna Nesselbush, R.I. Coalition against Domestic Violence, for plaintiff.

James E. O'Neil, Atty. Gen., Jane McSoley, Jeffrey Greer, David Morowitz, Asst. Attys. Gen., for defendant.

OPINION

SHEA, Justice.

This matter comes before the Supreme Court on the appeal of Ann McMaugh (McMaugh or petitioner) from a Superior Court denial of her petition for postconviction relief. In her petition she claimed that she was a victim of battered woman's syndrome. For the reasons set forth below we reverse the ruling of the trial court, grant the petitioner's application for postconviction relief, and remand to the Superior Court for a new trial.

The events that give rise to this appeal are set out in *State v. McMaugh*, 512 A.2d 824 (R.I.1986). In brief, the facts are as follows. On the evening of August 15, 1980, McMaugh and her husband were having drinks at the bar in the Causeway Lounge (lounge) in Smithfield, Rhode Island. Shortly after arriving, Gregory Dube (Dube) approached McMaugh and began talking with her. When her husband returned from the restroom, he exchanged words with Dube. The two men stepped outside the lounge, and an argument ensued. McMaugh's husband returned to the bar, and shortly thereafter they departed for home.

At home the husband retrieved two handguns, a .41–caliber magnum and a .22–caliber semiautomatic. They then returned to the parking lot of the lounge at approximately 2 a.m. A short time later, Dube exited from the lounge with friends, and the husband called Dube over to the car. Another argument ensued between Dube and the husband, who was sitting in the driver's seat of the car. Moments later two shots were fired from the car. The second shot, from the .22–caliber pistol, killed Dube. When the police apprehended the couple a short distance from the scene, the husband said to the officer that he was the one they were looking for because he had just shot someone. On the basis of this evidence a jury found both McMaugh and her husband guilty of murder in the first degree, conspiracy, and carrying a pistol without a license. They were sentenced to life imprisonment. The husband was also convicted of assault with a dangerous weapon. This court denied their joint appeal from judgments of conviction. *See State v. McMaugh*, 512 A.2d 824 (R.I. 1986).

On July 11, 1986, McMaugh filed an application for postconviction relief in the Superior Court. Her petition was amended several times since the initial filing. The amended petition alleges that McMaugh is a victim of battered woman's syndrome. Specifically the petition alleges that her husband inflicted severe mental and physical abuse upon her and coerced her into describing the homicide in a way that would be favorable to him but prejudicial to her own best interests. She argues that one of the effects of this abuse was to render her incapable of assisting her counsel at trial. She also asserts that another effect of the abuse was that she was forced to make statements prior to trial that were involuntary and coerced. Specifically McMaugh takes the position that her husband forced her to testify that the .22-caliber pistol accidentally fired when she attempted to throw the gun toward the back seat of their car in order to keep it beyond Dube's reach as he struggled with McMaugh's husband. The legal result of these statements was to "lock" her into a trial defense and precluded her trial counsel from requesting certain instructions concerning the law to be applied. The petition also asserts that McMaugh was denied her right to a fair trial and was deprived of her right to present a defense. Finally McMaugh asserts that the evidence of the abuse and its effect upon her constituted newly discovered evidence that warrants the granting of a new trial.

In April of 1989 the state moved under G.L.1956 (1985 Reenactment) § 10–9.1–8 to dismiss McMaugh's petition.[1] In a written decision the trial justice denied the state's motion, citing this court's opinion in *State v. Fontaine*, 559 A.2d 622 (R.I.1989), as mandating an evidentiary hearing. The evidentiary hearing was conducted during the first five months of 1990. At the hearing, medical reports were received in evidence by agreement between state and petitioner, the testimony of expert witnesses was presented, and testimony by the attorneys who represented McMaugh at her trial and prior to it as well as testimony from family members and others was also heard. The evidence presented at the postconviction-relief hearing was very extensive.

The evidence given by all the medical professionals and evidence of family members verify the pattern of abuse that occurred in the McMaugh marriage. In 1974, after the birth of a daughter, McMaugh's only child, her husband would drink himself into insensibility several times a week, and the incidents of domestic violence began. During these episodes of violence the husband would hit McMaugh with his fists, grab and twist her hair to the point that large chunks would pull out of her scalp, and threaten her with weapons he kept about the house. The testimony showed that the abuse was triggered by the husband's belief that McMaugh's family was trying to separate her from him.

In 1978 McMaugh went to work at her father's motion-picture theater in order to help with family finances. At this time the cycles of violence worsened. The husband no longer apologized after the incidents of abuse. He would tell her that the abusive behavior was all her fault. Then he would force her to apologize to him, and he would forgive her. If McMaugh refused to apologize, the violence would escalate.

By early 1980 the husband had become ill and stopped working. He was around the house all day long and spent most of his time drinking. He also was taking heart medication and Valium at this time. His behavior became even less stable and less predictable.

Following the death of Dube only the husband was charged with first-degree

---

1. General Laws 1956 (1985 Reenactment) § 10–9.1–8 provides:

"Waiver of or failure to assert claims.—All grounds for relief available to an applicant at the time he commences a proceeding under this chapter must be raised in his original, or a supplemental or amended, application. Any ground finally adjudicated or not so raised, or knowingly, voluntarily and intelligently waived in the proceeding that resulted in the conviction or sentence or in any other proceeding the applicant has taken to secure relief, may not be the basis for a subsequent application, unless the court finds that in the interest of justice the applicant should be permitted to assert such a ground for relief."

murder and related weapons charges. Attorney Joseph A. Capineri (Attorney Capineri) entered his appearance on behalf of the husband. As a precaution and out of concern for her welfare, McMaugh's family retained attorney John Cicilline (Attorney Cicilline) to protect her interests.

After the husband was released on bail and returned home, the battering of McMaugh by her husband escalated. The husband began accusing McMaugh of being the cause of the shooting. He began reciting to her a version of what happened on the evening of the shooting and demanding that she agree with his version of the event. Disagreement resulted in violent abuse. A pattern began to emerge. The husband would drink late into the evening. Then he would bring up the shooting, claiming that he would go to jail for the rest of his life unless she helped him. The husband would tell McMaugh that she had to convince people that she did the shooting. He would argue that if she loved him, she would do this for him. He would again and again go through the incident in detail with his wife, telling what happened and demanding that she agree to his version. He kept pressing her to go with his attorney to tell the police the accident story that he believed would exonerate him. Rehearsals lasted until 2 a.m. or later, yet every morning McMaugh had to force herself to get up by 6 a.m. so that she could have her daughter ready to catch a 7:15 a.m. school bus. As the months passed she became numb with exhaustion.

On April 18, 1982, McMaugh accompanied her husband to his attorney's office. She discovered arrangements had already been made for her to give a statement to the Smithfield police. McMaugh was not expecting to give this statement. Attorney Cicilline was not informed that she would be making a statement. Both McMaugh and her husband gave written statements setting forth that she fired the fatal shot accidentally as she attempted to throw the .22–caliber pistol into the back seat of the car while her husband struggled with Dube.

As a result of an agreement between Attorney Capineri and an attorney from the Attorney General's office, McMaugh and her husband testified before the grand jury. As a result of their testimony the grand jury, on the resubmitted case, returned indictments against both McMaugh and her husband.

When the husband heard that they had both been indicted, he blamed his wife. He continued to force her to rehearse the story, and they also began to have question-and-answer sessions. These sessions were confirmed by their daughter, who heard and observed them. If McMaugh did not answer a question to the satisfaction of her husband, he would verbally berate her or hit her. McMaugh became so numbed by this abuse that she would react by sitting and staring at her husband. If McMaugh resisted, he became violent. One time she attempted to call the police, but he grabbed the telephone away from her and smashed it to pieces. By the time of trial McMaugh had endured nearly four years of abuse and domination. At trial McMaugh testified as her husband directed.

At the extended hearing on the application for postconviction relief McMaugh presented evidence from several experts regarding battered woman's syndrome. One expert was Angela Browne (Dr. Browne), who held a doctorate in psychology. Over the last ten years she has specialized in the area of family violence. She has lectured and taught on numerous occasions on the topic of battered woman's syndrome and is considered an expert in this field. Doctor Browne spent a total of twenty-one hours interviewing McMaugh over a two-year period. Relying upon information obtained during the interviews, Dr. Browne formed the opinion that McMaugh had been a victim of a pattern of violence and abuse by her husband for approximately six years prior to the night that Dube was shot. Doctor Browne viewed McMaugh's attempt to commit suicide as a reaction to the pattern of increasing violence inflicted by her husband.[2]

2. During her husband's campaign of terror at     the time just before the trial, McMaugh became

Doctor Browne testified that as a result of the focused pattern of abuse, McMaugh no longer could rationally assess her position in the relationship or what steps she might take to make a change. McMaugh succumbed to the wishes of her husband since she irrationally believed he was all-powerful. Doctor Browne concluded that based upon a reasonable degree of medical certainty, her conclusion was that McMaugh could not have adequately assisted counsel in preparation of her own defense at trial. Doctor Browne also testified that the psychological effects of the abuse would not necessarily be apparent to others. The doctor stated that contrary to lay expectations "typically an abused woman seems relatively normal" and that the effects of battering on Ann McMaugh would not necessarily have been apparent to her attorney at the time of trial in 1985. Doctors Vesvold Sadovnikoff (Dr. Sadovnikoff) and Deborah Kaiser (Dr. Kaiser) were of the same opinion.

Doctor Browne's testimony was supported by a psychiatric evaluation report prepared by Martin Bauermeister, Ph.D., M.D. (Dr. Bauermeister), which was admitted into evidence with the agreement of the state. Doctor Bauermeister is an associate professor of psychiatry and human behavior at Brown University. Doctor Bauermeister evaluated McMaugh at the request of her attorney. He concluded that as a result of the physical and mental abuse, McMaugh was

> "incapable of seeking out legal counsel for herself, of speaking up for herself, or of contradicting her husband when with his attorney. Thus she was unable to assist in her defense * * * mostly because she had become terrorized by her husband to present a story which was false and designed to exonerate him."

Admitted as an exhibit also was the deposition of Dr. Sadovnikoff, a board-certified psychiatrist. Moreover, he has worked for the state since 1956 as a consultant for the training school and the Family Court. In this capacity Dr. Sadovnikoff has conducted numerous evaluations of individuals for the court. Doctor Sadovnikoff was initially consulted to provide therapy for emotional trauma McMaugh was suffering after her commitment at the women's prison. It was during the course of this physician-patient relationship with McMaugh that Dr. Sadovnikoff came to the conclusion that she was a battered woman who would have been unable to inform her attorney at trial about the abuse she had suffered by her husband. It is important to note that the doctor reached this conclusion before he was aware that McMaugh's attorney was seeking postconviction relief on these grounds.

Doctor Kaiser, a clinical psychologist from New York, was hired by the state to determine whether McMaugh lacked the capacity to assist in her own defense at her murder trial. Doctor Kaiser has been widely considered an expert in the field of battered women. She has, in fact, testified previously in Rhode Island in a case involving a claim of battered-woman's syndrome. In her report, which was admitted into evidence, Dr. Kaiser concluded that although McMaugh had probably been battered throughout the years of her relationship with her husband, the abuse after the shooting had a specific purpose, namely, to force McMaugh to testify that the gun had fired accidentally. According to Dr. Kaiser, by the time of trial McMaugh did not have the capacity to "assist her counsel in the preparation and presentation of her own defense."

Attorney Cicilline testified about his representation of McMaugh following the August 1980 shooting death of Dube. The only

---

so desperate that she attempted to commit suicide.

The hospital report indicates that while she was fighting with her husband, McMaugh threatened that she would take a large quantity of Ativan pills. As the fighting continued, McMaugh broke away from her husband and took approximately twenty-five of the tablets.

McMaugh was taken to the hospital by her husband, and she remained in the hospital for the evening. The treating doctor indicated that she was being treated for emotional problems. It is sad to note that the hospital report stated, "[T]he patient was discharged to the care of her husband."

time Attorney Cicilline recalled being able to meet alone with McMaugh was while her husband was being held pending a bail hearing. Once he was released on bail, he insisted on being present at every meeting Attorney Cicilline had with McMaugh. The husband would refuse to leave the room when asked to do so, he did all the talking and McMaugh, said very little other than to agree with him. The husband and Attorney Cicilline engaged in numerous arguments over the husband's wish to have McMaugh exculpate him with the accident story. Cicilline advised McMaugh not to come forward with the accident story because it did not make sense and because the forensic expert evidence would wholly discredit the story. As noted previously, at this time only the husband had been charged with murder.

Attorney Cicilline learned that McMaugh had disregarded his advice only after he read in the newspaper that she had been indicted for murder. He planned to protect his client's interests by filing motions to sever the two cases for trial and to suppress her statements to the police and to the grand jury. After an argument with the husband over these proposed actions, Attorney Cicilline was replaced by attorney William A. Dimitri, Jr. (Attorney Dimitri), as counsel for McMaugh.

Attorney Dimitri testified that he met with McMaugh six or seven times before trial. Her husband attended each of these meetings and dominated the conversation. She was passive during these meetings. Dimitri commented that the "biggest problem" he had as trial counsel was being "locked into a defense" based on McMaugh's testimony before the grand jury. He also stated that had he been aware of the abuse McMaugh had sustained, it would have made a big difference in regard to how he would have presented her defense. He would have filed a motion to suppress the statements she made to the police and the grand jury and a motion to sever. Additionally, Attorney Dimitri testified that he would have asserted a defense based on coercion.

After her conviction and sentencing to life imprisonment, attorney Sumner Stone (Attorney Stone) was engaged to represent McMaugh on the question of custody of her daughter. Attorney Ira Schreiber (Attorney Schreiber) was engaged to prosecute an appeal and a petition for postconviction relief. Both attorneys, after having separately met with McMaugh several times, concluded that she was afraid of her husband and that she would not take any action that would adversely affect her husband's case. Attorney Stone testified that she had the irrational belief that her husband was omniscient and all-powerful, capable of hearing anything she said and capable of inflicting abuse upon her even though she was locked up in the women's prison and he was locked up in the men's prison. Attorney Stone felt that the husband was "sort of a Charlie Manson figure" or "Svengali" who controlled McMaugh absolutely.

In a written decision the trial justice held that the evidence presented at the evidentiary hearing for the postconviction relief established that McMaugh was competent to stand trial. The trial justice did not question or doubt that the physical and mental abuse had in fact occurred. The trial justice rejected the opinion of the experts that McMaugh was unable to assist her lawyer at the trial. The court found that she was able. The trial justice also held that the evidence did not support McMaugh's contention that she was subjected to duress that could operate as a defense to the crime charged. The trial justice noted many instances of assertive behavior on the part of McMaugh during the trial, which, in the opinion of the trial justice, negated her claim that she was unable to assist her counsel at trial. Finally the trial justice rejected McMaugh's claim that the evidence of the battering constituted newly discovered evidence. Relying on these findings, the trial justice denied McMaugh's petition for postconviction relief.

McMaugh argues on appeal that it was error for the trial justice to ignore the uncontradicted evidence that the husband's domination over McMaugh prevented her

from assisting her trial counsel and presenting a reasonable defense.

## BATTERED WOMAN'S SYNDROME

Domestic violence is a serious social and legal problem facing our nation as well as this state. It is estimated that a woman is beaten somewhere in this country every eighteen seconds; millions of American women are estimated to be affected by abuse in intimate relationships. *Report of the Gender Bias Study of the Supreme Judicial Court*, 23 Suffolk Univ.L.Rev. 575, 584 (1989) (citing U.S. Bureau of Justice Statistics, 1986). Many of the women suffering from abuse can be classified as part of a group of women who suffer from battered woman's syndrome.

Battered woman's syndrome is "a series of common characteristics that appear in women who are abused physically and psychologically over an extended period of time by the dominant male figure in their lives." *State v. Kelly*, 97 N.J. 178, 193, 478 A.2d 364, 371 (1984). A prominent commentator in the field of battered woman's syndrome defines a battered woman as a woman

> "who is repeatedly subjected to any forceful physical or psychological behavior by a man in order to coerce her to do something he wants her to do without concern for her rights. Battered women include wives or women in any form of intimate relationships with men. Furthermore, in order to be classified as a battered woman, the couple must go through the battering cycle at least twice. Any woman may find herself in an abusive relationship with a man once. If it occurs a second time, and she remains in the situation, she is defined as a battered woman." *Id.* (quoting L. Walker, *The Battered Woman* at XV (1979)).

It has also been stated that:

> " 'Learned helplessness' is another aspect of BWS [battered woman syndrome]. The battered woman often does not know why she is beaten on any particular occasion. The violence is perceived by the woman as 'random and aversive stimulation.' Because of its randomness, she believes she is incapable of doing anything to prevent the abuse and, as a result, feels helpless. Women who attempt to defend themselves usually succeed only in eliciting laughter from the batterer and/or provoking more abuse, accentuating the feeling of helplessness." *People v. Aris*, 215 Cal. App.3d 1178, 1195, 264 Cal.Rptr. 167, 172 (1989).

Thus, once the woman "learns" that she is helpless, she does not then have the ability to escape the batterer's control on her own.

It is well established that battered women have several common personality traits. These traits include low self-esteem, traditional beliefs about the home, the family, and the female sex role, tremendous feelings of guilt that their marriages are failing, and the tendency to accept responsibility for the batterer's actions. *Kelly*, 97 N.J. at 195, 478 A.2d at 372. The presence of these characteristics leads to the stereotype of the battered woman as fragile, haggard, fearful, passive, lacking job skills, and economically dependent on her batterer. Nevertheless, the existence of this list of traits does not mean that all battered women look and act the same. Although some battered women may have some of or all these characteristics, it is entirely possible for a battered woman not to evidence any of these characteristics.

## POSTCONVICTION RELIEF

When addressing an application for postconviction relief, the trial justice applies the standard used for awarding a new trial. *Fontaine v. State*, 602 A.2d 521, 524 (R.I.1992); *State v. Lanoue*, 117 R.I. 342, 346, 366 A.2d 1158, 1160 (1976). This standard involves the application of a two-part test. To satisfy the first part, the threshold test, the trial justice must determine (1) if the newly discovered evidence actually is newly discovered or available only since the trial, (2) if the petitioner was diligent in attempting to discover the evidence for use at the original trial, (3) that the evidence is not merely cumulative or impeaching but is also material to the issue, and (4) that the evidence is of a kind

that would probably change the verdict at a new trial. *Fontaine*, 602 A.2d at 524; *State v. Brown*, 528 A.2d 1098, 1104 (R.I. 1987). If the trial justice concludes that the threshold test has been satisfied, it must then be determined "whether the evidence presented is credible enough to warrant relief, a determination made by [the trial justice] accepting or rejecting conflicting testimony by exercising his or her 'independent judgment.'" *Fontaine*, 602 A.2d at 524. In summary the trial justice must find that the new evidence satisfies both the threshold test and the credibility test before the application for postconviction relief may be granted. *Id.*

■ To determine if the two-part test is satisfied, the trial justice weighs the evidence and assesses the credibility of witnesses presented during the hearing. *Id.* It is well established that this court defers to the credibility determination made by the trial court on an application for postconviction relief. Therefore, our review is limited to determining whether the decision of the trial justice is clearly wrong or whether, in reviewing the evidence, we conclude that relevant and material evidence was overlooked or misconceived. *Id.* at 525; *State v. Henshaw*, 557 A.2d 1204, 1207 (R.I.1989); *State v. Estrada*, 537 A.2d 983, 986 (R.I.1988).

■ Here we must determine whether both parts of the test have been satisfied. In regard to the first, a review of the record below reveals that it was not until after McMaugh began serving her sentence that she was able to reveal that she was the victim of an extremely focused campaign of abuse and domination that prevented her from assisting her own trial attorney and presenting a credible defense. The uncontradicted evidence is that because of the battering she was subjected to by her husband, McMaugh was precluded from coming forward with exculpatory evidence for use at the original trial. It was not until the spring of 1986, over a year after the trial was completed and McMaugh had been separated from her husband by their incarceration in separate prisons, that Attorney Stone and Dr. Sadovnikoff were able to discover the battering she had been subjected to by her husband. We face, therefore, a very compelling argument that the evidence portraying McMaugh as a battered woman constitutes newly discovered evidence.

■ The second part of the threshold test requires that the petitioner be diligent in attempting to discover the evidence for use at the original trial. To apply this requirement in the situation before us would be inappropriate. The evidence is uncontradicted that McMaugh could not freely express to others the extent of the battering she endured while she was still in the presence of her husband. As the experts testified, an individual subjected to battered woman's syndrome is incapable of freeing herself from the influence of the batterer. Thus McMaugh could not have fully assessed the reality that she was a battered woman, with all the legal ramifications of that assessment, until prison confinement physically, and eventually mentally, separated her from her abusive husband. Consequently we conclude that it would be appropriate to waive the second part of the threshold test in this instance.

■ Moreover, the evidence of the battering in this case is not cumulative or merely impeaching. Rather it is material to the issue of whether McMaugh could assist her counsel in preparing a defense that served her best interests. The evidence shows that her husband's domination forced her, against her will and against the advice of her counsel, to come forward with the "accident" story that the husband had fabricated. As a result of her testimony before the grand jury she was indicted along with her husband for murder. Until that point the authorities never intended to charge her. Domination by the husband prevented her from requesting separate trials. That domination prevented her from informing her attorney that the reason she returned with her husband to the lounge parking lot was that she actually feared for her own welfare if she did not accompany her husband back to the lounge.

■ Finally, evidence of battered woman's syndrome could change the verdict of first-degree murder at a new trial if believed by the factfinder. The evidence, if believed, would rebut the element of premeditation that is an essential part of the crime for first-degree murder. Moreover, the evidence could even exonerate McMaugh because, if believed, it could establish that she did not commit the crime at all. Having met the requirements of the threshold test, we move on to the next test.

■ To satisfy the second part of the test, the evidence presented in support of the petition must be credible enough to warrant relief. The experts in this case were unanimous in their opinion that McMaugh was a severely battered woman for many years prior to the night Dube was shot. They all agreed also that following the shooting the husband waged a very focused campaign of physical and mental abuse aimed at compelling her to adopt his version of events on the night of the shooting. All four experts concluded that as a result of this focused pattern of abuse and domination McMaugh could no longer rationally assess her position in the relationship and determine what steps might be taken to make a change. All the experts concluded that as a result of this extremely focused and violent campaign of terror, she was unable to participate in the preparation of her own defense, independent of her husband's influence at their joint trial for murder. All the experts, including the state's expert, formed the opinion, based on a reasonable degree of medical certainty, that McMaugh did not have the ability to assist her trial counsel adequately in preparation of her own defense.

The opinions of the experts were corroborated by Attorneys Cicilline and Dimitri, both of whom are experienced and well-known criminal defense attorneys. Both testified that McMaugh's husband was present during every meeting, refused to leave when asked to do so, did all the talking, and demanded that they be tried together, and that McMaugh passively agreed. Attorney Cicilline also described arguments he had with the husband about McMaugh's coming forward to exculpate the husband with the accident version that made no sense, about the filing of motions to sever, and after McMaugh's indictment, about the filing of motions to suppress her statements and grand jury testimony. Attorney Dimitri testified about an occasion when the husband became furious when Dimitri attempted to have a private discussion with McMaugh in the corridor outside the courtroom during a break in the trial.

Therefore, we conclude that the trial justice ignored uncontradicted evidence. The uncontradicted evidence indicated that the husband's domination through a focused pattern of extreme physical and mental abuse prevented McMaugh from assisting her attorney and presenting a reasonable defense. The trial justice's conclusion that McMaugh did not look or act like a battered woman overlooks the testimony of the experts that the effects of the abuse would not necessarily have been apparent to other persons involved with the trial. As the research in this area indicates, an abused woman may appear and act relatively normal. It is a matter in which the impressions of a lay person in the field would more than likely tend to mislead rather than assist the factfinder in a search for the true facts. The opinions of qualified and informed experts should not be arbitrarily overlooked.

■ Today we acknowledge that this court does recognize that battered woman's syndrome is a mental or an emotional condition that can affect women and that it does have certain legal consequences. Nevertheless we intend that a defendant's assertion of the condition be exposed to the most exacting scrutiny to determine its legitimacy in each factual circumstance in which it is presented. When the issue of battered woman's syndrome is raised as a defense in a criminal trial, we hold that the state will not be required to disprove it beyond a reasonable doubt. *See Leland v. Oregon*, 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952). Rather, a defendant will be required to prove the existence of the condition as an affirmative defense by a fair preponder-

ance of the evidence. The defendant must bear the burden to prove the existence of facts that would constitute the battered-woman's-syndrome defense. The petitioner in this case has sustained her burden.

For all these reasons the petitioner's appeal is sustained, the application for post-conviction relief is granted, the judgments of conviction for murder in the first degree, conspiracy, and carrying a pistol without a license are vacated and the case is remanded to the Superior Court for a new trial.