1. The applicant originally named George A. Vose, Jr. (Vose), the Director of the Rhode

aside $150,000 to retain the auditor, the commission has breached § 39–1–26(b). We find this argument wholly without merit. There is no evidence that the commission exceeded its authority by requiring the NBC to finance the auditor position.

### Conclusion

The NBC has failed to demonstrate that the commission exceeded its authority or acted illegally, arbitrarily, or unreasonably when it ordered the retention and funding of an independent auditor. The independent auditor must not invade the prerogative of the NBC to manage the CSO project. Accordingly, for the reasons stated herein, the NBC's petition for certiorari is hereby denied. The writ previously issued is quashed. The order of the commission requiring the NBC to retain and finance an independent auditor is affirmed. The papers in the case may be returned to the commission with our opinion duly endorsed thereon.

**Carlton J. BLEAU,**

v.

**Ashbel T. WALL et al.[1]**

**No. 2001–612–C.A.**

Supreme Court of Rhode Island.

Nov. 4, 2002.

Island Department of Corrections, as defen-

dant. Ashbel T. Wall replaced Vose, and there- fore, the caption has been changed.

Leo F. Manfred, Westerly, for Plaintiff.

Annie Goldberg, Stephen A. Regine, Providence, for Defendant.

Present: WILLIAMS, C.J., LEDERBERG, FLANDERS, and GOLDBERG, JJ.

## OPINION

WILLIAMS, Chief Justice.

The state asks this Court to reverse a Superior Court hearing justice's order granting Carlton J. Bleau's (Bleau) application for post-conviction relief based on newly discovered evidence. The state asserts that the hearing justice abused his discretion in setting aside the verdicts and sentences imposed against Bleau without an evidentiary hearing. The state further contends that the hearing justice erred in determining that the newly discovered evidence was material. We agree with the state.

## I

### Facts and Travel

On the early morning of January 14, 1988, Mary Todd (Mary)[2] gave Bleau a ride home from a Central Falls bar. Bleau directed her down unfamiliar streets. When she finally stopped her car, Bleau sexually assaulted her and then slashed the car tires. Bleau fled to New York before trial and was not located until 1992. In 1993, he finally faced a jury on the charges stemming from the 1988 assault.

At trial, Mary testified that she played pool with Bleau the night of the assault and then agreed to give him a ride home after the bar closed. Her testimony included a detailed description of the sexual assault that occurred in her car. Before leaving the stand, Mary positively identified Bleau as the assailant.

The prosecution also offered the testimony of Agent Michael Malone (Malone), senior examiner from the Hair and Fibers Unit of the FBI laboratory, to testify about the hairs found in the car and on Mary's clothes and the fibers discovered on the knife allegedly used in the assault. Malone testified that the hairs from Mary's clothing and vehicle "completely matched" the samples from Bleau's head. In reference to the fibers found on the blade and in the well of the knife allegedly used to cut Mary's undergarment and jeans, Malone stated that the fibers from the knife microscopically matched those taken from the jeans. Moreover, Malone explained that his lab utilizes a "microspectral monitor" so sensitive that it can identify a specific dye.

The jury convicted Bleau of two counts of first-degree sexual assault, one count of second-degree sexual assault and one count of malicious destruction of property. The trial justice sentenced Bleau to two forty-five-year concurrent terms for the two first-degree sexual assault charges, ten additional years for the second-degree sexual assault and a concurrent one-year term for malicious destruction of property. This Court affirmed those convictions two years later. *See State v. Bleau,* 668 A.2d 642, 646 (R.I.1995).

In 1997, the United States Inspector General (IG) issued a report detailing the results of an investigation into questionable FBI laboratory practices. The United

2. To protect the privacy of the victim, we have chosen "Mary Todd" as an alias.

States Department of Justice (Department of Justice) forwarded the report to the Rhode Island Attorney General (Attorney General). The IG's findings prompted the FBI to employ forensic scientists to review the cases involving the work and testimony of examiners who were suspected of giving false or inaccurate testimony in criminal cases. Forensic scientist Steve Robertson (Robertson) conducted a review of Malone's files and testimony concerning Bleau. The Department of Justice also forwarded Robertson's report to the Attorney General.

Robertson's report indicated that there was insufficient documentation to determine whether Malone conducted the tests in a scientifically acceptable manner. Specifically, Robertson concluded that Malone's testimony differed dramatically from the laboratory report and that his testimony about the blue and white fibers from Mary's clothing was misleading and overstated. The report pointed out that Malone testified that he examined certain items, whereas the notes indicated that a technician conducted the examination. Additionally, Robertson found that Malone incorrectly testified about the ability of the microspectral monitor; contrary to Malone's testimony, it cannot be used to identify a specific dye. Robertson's report did, however, note that a second examiner confirmed Malone's findings concerning the microscopic match of the hair samples, and Robertson did not dispute those findings. After learning of the federal government reports criticizing the work and credibility of Malone, Bleau filed an application for post-conviction relief based on newly discovered evidence.[3]

Based exclusively on these reports, the hearing justice granted Bleau's post-conviction relief application. Despite the state's request for an evidentiary hearing, the hearing justice refused to conduct one. Finding no factual dispute, the hearing justice concluded that "if [the] information regarding * * * Malone's outrageous misconduct were available to defense counsel at the time of trial and were placed before a jury, [he] simply could not fathom a jury rendering a verdict of guilty." The hearing justice set aside the verdicts and sentences imposed against Bleau. After an unsuccessful attempt to locate the hearing justice to seek a stay of his order pending an evidentiary hearing, the state obtained an emergency stay from a duty justice of this Court. The next morning, the same hearing justice denied the state's motion to stay the order granting post-conviction relief. The hearing justice informed the state that the indictment would remain open and Bleau would be released if not retried within six months. The state then requested an expedited appeal. We agreed to expedite.

## II

### Standard of Review

Pursuant to G.L.1956 § 10–9.1–1, a person may file an application for post-conviction relief if he or she believes that "the conviction violated [his or her] constitutional rights or that newly discovered facts require vacation of the conviction in the interest of justice." *Powers v. State*, 734 A.2d 508, 513–14 (R.I.1999) (quoting *Mastracchio v. Moran*, 698 A.2d 706, 710 (R.I.1997)). "We will not disturb a trial justice's findings on an application for post-conviction relief absent clear error or a showing that the trial justice overlooked or misconceived material evidence." *State v. Thomas*, 794 A.2d 990, 993 (R.I.2002) (citing *Ouimette v. State*, 785 A.2d 1132, 1135 (R.I.2001)). This Court will review

---

3. Malone is no longer employed by the FBI.

*de novo* any post-conviction relief decision involving questions of fact or mixed questions of law and fact pertaining to an alleged violation of an applicant's constitutional rights. *See id.* (citing *Ouimette,* 785 A.2d at 1135). However, "[f]indings of historical fact, and inferences drawn from those facts, will still be accorded great deference by this Court, even when a *de novo* standard is applied to the issues of constitutional dimension." *Id.* (quoting *Ouimette,* 785 A.2d at 1135).

## III

### Evidentiary Hearing Requirement

Although we refer to the justice that presided over the post-conviction relief proceeding as the "hearing justice," we do not intend to imply that he held an evidentiary hearing. At the post-conviction relief proceeding, both parties presented oral arguments and the hearing justice admitted the various components of the newly discovered evidence as exhibits. No witnesses testified. No other evidence was admitted. No findings of fact were made. There was no evidentiary hearing.

The state argues that the hearing justice abused his discretion by failing to hold an evidentiary hearing before granting Bleau's application for post-conviction relief. We agree.

■ For six days, a jury of Bleau's peers came to court, afforded Bleau his constitutional right to a trial by jury and accomplished their critically important task of fact-finding. During those six days, the jury heard from ten witnesses, examined numerous exhibits, and deliberated for more than one full day. Based on the totality of that evidence, the jury unanimously found Bleau guilty beyond a reasonable doubt. This Court then affirmed the convictions and sentences on appeal. We will not now allow a conviction to be vacated without first conducting an evidentiary hearing to establish that such a result is warranted.

We understand the hearing justice's repugnance with a national law enforcement agent's calumny; however, we must be certain that any questionable witness's conduct before or at trial does not result in the extreme consequence of vacating a conviction without a full evidentiary hearing.

## IV

### Post–Conviction Relief Analysis

■ In analyzing a post-conviction relief application based on newly discovered evidence, we apply the standard used for awarding a new trial based on newly discovered evidence. *See Brennan v. Vose,* 764 A.2d 168, 173 (R.I.2001) (citing *McMaugh v. State,* 612 A.2d 725, 731 (R.I. 1992)). The standard consists of a two-part test. "The first part is a four-prong inquiry that requires that the evidence be (1) newly discovered since trial, (2) not discoverable prior to trial with the exercise of due diligence, (3) not merely cumulative or impeaching but rather material to the issue upon which it is admissible, [and] (4) of the type which would probably change the verdict at trial." *State v. Hazard,* 797 A.2d 448, 463–64 (R.I.2002) (quoting *State v. L'Heureux,* 787 A.2d 1202, 1207–08 (R.I. 2002)). For the second part of the inquiry, the hearing justice must exercise his or her discretion and determine whether the newly discovered evidence is credible enough to warrant relief. *See Hazard,* 797 A.2d at 464; *Brennan,* 764 A.2d at 173.

At the proceeding in this case, the parties agreed that the evidence was both newly discovered and not discoverable before trial. However, the state and Bleau disagreed about the materiality of the evidence and whether it was likely to change

the outcome of the trial. The hearing justice found that the newly discovered evidence was material to Bleau's conviction and would have changed the verdict. On appeal, the state argues that the report was merely cumulative, impeaching and immaterial and it would not have changed the outcome of the trial. We agree.

 In determining materiality, this Court relies on *Kyles v. Whitley,* 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), which provides that the:

> "touchstone of materiality is a 'reasonable probability' of a different result * * *. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.' " *Powers,* 734 A.2d at 514 (quoting *Kyles,* 514 U.S. at 434, 115 S.Ct. at 1566, 131 L.Ed.2d at 506).

A trial justice must "not determine whether there was sufficient evidence to convict absent the discounted evidence but must instead determine whether the previously undisclosed [or newly discovered] favorable evidence puts the case in such a different light as to undermine confidence in the verdict." *Broccoli v. Moran,* 698 A.2d 720, 726 (R.I.1997).

 The newly discovered evidence in this case lacks materiality. Malone's testimony was not essential to Bleau's guilt; it merely confirmed his presence at the scene a fact which never was in dispute. Malone offered no evidence about the sexual assault on Mary. He simply analyzed the similarity between the hair and fiber samples collected from the car and Mary

and samples taken from Bleau. However, Bleau's presence at the scene was never at issue.

Not only did other witnesses testify to Bleau's presence in Mary's car, but also Bleau's own attorney in closing arguments said, "you don't really have to worry, I don't think, about whether the person in the car with [Mary] was Carlton Bleau. I think [that] * * * you can decide beyond a reasonable doubt that it was." He also said "I think he's guilty beyond a reasonable doubt of getting out of the car, [and] slashing the tires, for whatever reason." Despite the fact that comments made in closing arguments are not evidence, *see State v. Garcia,* 649 A.2d 1025, 1026 (R.I. 1994), those comments certainly indicate that Bleau never disputed his presence at the scene.

 The problem with the hearing justice's conclusion about materiality is the misconception that an FBI agent's inaccurate testimony always is material. Although improper testimony always is a serious matter, it is not always "material." The hearing justice understandably was upset with Malone's behavior, and this Court is likewise offended by the actions of this rogue agent. The hearing justice found that the conduct shocked the conscience of the court and said that "you could not find a person that is legally competent that would say that it's perfectly all right for the police scientists to fabricate and to act in an arbitrary fashion * * *." We agree with the hearing justice that Malone's conduct is unacceptable. However, the nature of the conduct is not always relevant to the materiality determination.

Contrary to the hearing justice's holding, the materiality inquiry is not about whether Malone acted improperly or whether he was a "renegade, rogue, foren-

sic scientist." Instead, the focus should have been on whether a nexus existed between Malone's conduct and the outcome of the trial, creating the likelihood of a different outcome or undermining the confidence in the verdict.

In addition to being immaterial to the conviction, the newly discovered evidence is cumulative. Malone's testimony about matching hairs and fibers was offered in addition to the complaining witness's identification of Bleau as the assailant and defense counsel's admission of Bleau's presence. Cumulative evidence is defined as "[a]dditional or corroborative evidence to the same point. That which goes to prove what has already been established by other evidence." Black's Law Dictionary 380 (6th ed.1990). Consequently, Malone's testimony was cumulative to the extent that it was offered to prove Bleau's admitted presence at the scene.

Not only is the evidence cumulative and immaterial, but it also is impeaching. New information that is not related to defendant's guilt or innocence and serves only to destroy the credibility of the evidence merely is impeaching. *See Mastracchio*, 698 A.2d at 713. The fact that Malone previously lied on the stand would serve only to destroy his credibility.

Moreover, even the line of questioning that the hearing justice speculated would have occurred if the evidence was available at trial shows that its only value would have been for impeachment. The trial justice hypothesized that the questioning would proceed as follows:

" 'Are you the same Mr. Malone that has been found to be a prevaricator and a falsifier by your own Inspector General and who says that machines used for scientific testing have more abilities and capacities than they, in fact, do?'

" 'Are you the same Mr. Malone who was involved in another matter of considerable importance to the people involved in which you fabricated and falsified testimony?'

"And maybe even defense at that time, because the newly-discovered evidence is not just the report itself, but is the identity of a man named Stephen Robertson who worked for the Inspector General or the Inspector General Department of the FBI, maybe the defense flies him up, puts him on the stand * * * and indeed maybe Mr. Robertson could be asked, 'What is the reputation of Mr. Malone for truthfulness and honesty within the community of forensic scholars at the FBI crime lab?'

"I dare say Mr. Robertson would answer, 'It is not good. His reputation is that he will not behave in a professional and truthful manner.' Now, assuming that is placed in front of the jury, what do you think they'd do with the testimony?" [4]

Although it is apparent to this Court that the newly discovered evidence in this case did not justify the order granting post-conviction relief, we wish to make it perfectly clear that we do not condone Malone's conduct. We understand the hearing justice's frustration with the misconduct of a national law enforcement agent. However, it is imperative that we do not allow that justified aggravation to blur our focus on the task before us; the law requires that we disregard newly discovered evidence that is cumulative, impeaching or immaterial. The newly discovered evidence in this case is all of the above.

### Conclusion

Accordingly, the state's appeal is sustained and the judgment of the Superior

4. We are not ruling on the admissibility of this evidence.

Court is reversed. The papers of the case are remanded with instructions to deny and dismiss Bleau's application for post-conviction relief for the reasons set forth above.