Rocco D'Alessio                     :

v.                                  :

State of Rhode Island.              :

NOTICE:  This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Tel. 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Rocco D'Alessio          :

v.                       :

State of Rhode Island.   :

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**O P I N I O N**

**Justice Flaherty, for the Court.** The applicant, Rocco D'Alessio, appeals from the denial of his application for postconviction relief. This case first came before the Supreme Court for oral argument on December 5, 2012, pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not be summarily decided. After hearing the arguments and examining the memoranda filed by the parties, we concluded that cause in fact had been shown, and we assigned the case to the regular calendar for full briefing and argument. Thereafter, the matter was argued on September 30, 2014. For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

**I**

**Facts and Travel**

On May 29, 2007, Rocco D'Alessio filed an application for postconviction relief in Providence County Superior Court. The applicant argued that newly discovered evidence required that his April 16, 2002, conviction for the second-degree murder of his infant daughter,

Gianna D'Alessio, be vacated. At a hearing conducted before a justice of the Superior Court, applicant presented the testimony of Dr. Richard T. Callery, who, while he was employed on a contract basis with Rhode Island's Office of State Medical Examiners (OSME), had reviewed the file of Gianna D'Alessio.

Briefly, the facts leading to applicant's conviction are as follows.[1] On the evening of January 13, 2000, applicant was caring for his infant daughter at the Providence home that he shared with Gianna's mother, Jennifer Greenhalgh. The couple had resided there for little over a month. Ms. Greenhalgh left Gianna in applicant's care while she returned to work, her first shift back at her job since Gianna's birth. Before Ms. Greenhalgh left for work, the two had become involved in an argument about why applicant was late in arriving home, causing her to be late in leaving for work. Their argument continued when Ms. Greenhalgh informed applicant that she had hidden a stash of cocaine so that he would not be able to use the drug while he was babysitting Gianna. The applicant became upset and persisted, and Ms. Greenhalgh eventually revealed to him where the cocaine was located so that she could leave for work. Before she left the home, Ms. Greenhalgh made sure applicant had calmed down and, once he did so, she departed for work at about 4 p.m., leaving Gianna in his care.

Approximately an hour later, a Rescue Company of the Providence Fire Department, commanded by Lt. Alan Fortes, responded to the home of applicant's neighbor because of a report that a child was having difficulty breathing. Lieutenant Fortes and other rescue personnel arrived to find applicant holding a sleeping Gianna. He told them that the child was having trouble breathing and was not acting right. The child was examined and appeared to be generally healthy, perhaps simply colicky, or constipated. Lieutenant Fortes asked applicant if he wished

---

[1] A more extensive recitation of the facts of Gianna's death and the subsequent trial is articulated in this Court's opinion at State v. D'Alessio, 848 A.2d 1118, 1120-23 (R.I. 2004).

that Gianna be brought to the hospital, but deferred to applicant's decision not to do so.[2] Lieutenant Fortes and his colleagues then departed the residence and left Gianna with applicant.

Lieutenant Fortes and his company received a second call for an unresponsive baby around 8 p.m., this time to applicant's residence. The first responders arrived at the address and, alerted by a light, proceeded around to its source at the back of the house. The applicant emerged from the house holding Gianna out towards Lt. Fortes, who could immediately see that the child was not breathing. Gianna was transported to Hasbro Children's Hospital in Providence, where she was pronounced dead soon after arriving.

On May 19, 2000, applicant was indicted for first-degree murder. At trial in April, 2002, the state medical examiner, Dr. Elizabeth Laposata, testified that the case was one of Shaken Baby Syndrome.[3] Doctor Laposata testified that Gianna's injuries resulted from "absolutely violent trauma" and not from any accidental means. She went on to say that death would have resulted "within a few minutes" from the infliction of the injuries. Doctor Laposata stated she had no doubt that the injuries were caused by a violent shaking of the infant.[4] Further, she testified that she had arrived at her conclusion from the very moment she witnessed the autopsy. Several months later, but before she testified, Dr. Laposata confirmed her opinion with Dr. Selina Cortez, a neuropathologist at Rhode Island Hospital. The evidence at trial revealed that the infant had been in applicant's sole custody throughout the evening. On April 16, 2002, the

---

[2] Lieutenant Fortes testified that he asked applicant if he wished his daughter to be transported to the hospital three times, which was Lt. Fortes' standard practice when he did not believe that transport was required.

[3] Doctor Laposata testified that Shaken Baby Syndrome is characterized by the types of injuries that result from "violent, forceful shaking of a baby." These injuries include tears in blood vessels in the brain and nerve damage that ultimately cause death.

[4] At a hearing on a motion for a new trial, the trial justice made a point to note that Dr. Laposata's testimony was particularly credible.

jury returned a guilty verdict for second-degree murder; the trial justice sentenced applicant to a term of sixty years, forty years to serve, with the balance suspended, with probation.

On May 29, 2007, D'Alessio filed an application for postconviction relief in which he alleged that newly discovered evidence required that he be granted a new trial. To support his application, D'Alessio offered the testimony of Dr. Richard T. Callery, who was, at the time of his testimony, the chief medical examiner for the State of Delaware. In the past, Dr. Callery had done contract work for Rhode Island's Office of State Medical Examiners. Several years after D'Alessio's conviction, Dr. Callery was approached at a medical conference by Georgia Pasqualone, a forensic nurse who had been retained by applicant's attorney. Ms. Pasqualone asked Dr. Callery if he would assist her by reviewing a file she had been given by applicant's attorney. Doctor Callery immediately remembered Gianna D'Alessio's file as one that he had worked on while in Rhode Island. Doctor Callery was put in touch with applicant's attorney, who determined that Dr. Callery's testimony would be relevant to the postconviction-relief application.[5] Eventually, Dr. Callery testified at an evidentiary hearing that was held on July 8, 2011, before the original trial justice. Doctor Callery was qualified as an expert witness in forensic sciences. At the hearing, the state did not contest whether Dr. Callery's testimony was indeed newly discovered, but did argue that it was not material. The differences between the testimony of Dr. Laposata and Dr. Callery became the main issue in applicant's postconviction-relief proceedings.

In his testimony, Dr. Callery related how he was tasked by Dr. Laposata with reviewing and finalizing incomplete reports for several autopsies that had been performed by Dr. Samuel A. Livingstone, a medical examiner who was no longer with the office. As part of this process, Dr.

---

[5] D'Alessio was represented by several attorneys before his present attorney began to represent him on this appeal on January 16, 2013.

- 4 -

Callery had reviewed the file of Gianna D'Alessio in 2000, shortly after the infant's death and well before D'Alessio's trial. The practice of reviewing such files was routine for Dr. Callery, who had worked for OSME on a contract basis since 1988. When he first reviewed the D'Alessio file, it contained preliminary findings and conclusions that had been made by Dr. Livingstone.

Doctor Callery testified that, at the time he first saw the D'Alessio file, the manner of death had been determined to be homicide and the matter had been considered a "Shaken Baby Syndrome type case." It was Dr. Callery's duty to go through the police report, hospital records, and autopsy notes and provide his opinion on whether the initial conclusion was correct. However, Dr. Callery testified that he could not "fix the case," because of the poor quality of the notes and photographs that were in the file. Doctor Callery said that he told Dr. Laposata, "[he could not] sign off on this as a shaken baby, and [he could not] determine it's a homicide." Doctor Callery then gave the file back to Dr. Laposata and had no further contact with it.

Doctor Callery testified that he had come to "no conclusion whatsoever" with respect to the file and instead returned it to Dr. Laposata to correct and finalize. Doctor Callery repeated his lack of a conclusion later in his testimony, saying he could not determine any cause of the child's death and he could not, at the time he reviewed the file, confirm the preliminary findings of Dr. Livingstone and Dr. Laposata.[6] Under cross-examination by the state, and a later lengthy questioning by the hearing justice, Dr. Callery said that he did not remember specifically what the file contained, but that it "should have included" materials like retinal slides and standard tissue samples of organs, including the brain. It is significant that, at the time Dr. Callery

---

[6] Under direct examination from D'Alessio's lawyer:
  "Q: And it's your opinion at that time that there could not be determined a cause of death as a homicide or that it was Shaken Baby Syndrome?
  "A: My testimony is I could not do it."

reviewed the file, it did not contain the supplemental neuropathology report by Dr. Cortez, which had been referred to in Dr. Laposata's trial testimony. Doctor Callery testified that it would have been possible to improve the file to such a degree that a conclusion could be made that the infant's death was a homicide caused by the violent shaking of a baby, but that in the file's then condition, "[he] didn't feel comfortable doing it."[7] In response to questioning by the hearing justice, Dr. Callery listed the possible manners of death that the medical examiner routinely cites: suicide, accident, undetermined, natural, and homicide. Doctor Callery finally said that in his estimation the manner of death was "[b]etween homicide and undetermined."

On September 19, 2011, the hearing justice issued a ruling from the bench on D'Alessio's application. The hearing justice found the evidence provided by Dr. Callery to be newly discovered and assumed, arguendo, that the evidence could not have been discovered in the exercise of trial counsel's due diligence. However, the hearing justice also found Dr. Callery's testimony to be "valueless," in that "such testimony would in no way have altered this jury's verdict." Further, the justice found that Dr. Callery's testimony lacked substantial weight and credibility and that it appeared to him to have been motivated by personal animus towards Dr. Livingstone, the original medical examiner who prepared the infant D'Alessio's file.[8] For those reasons, the hearing justice denied the application for postconviction relief. Judgment denying

---

[7] Doctor Callery testified, "[i]f new material had been generated and different things happened afterwards that allowed somebody else to [form the opinion Gianna's death was caused by homicide], so be it. I'm not here to criticize them."

[8] Additionally, and somewhat inopportunely, the hearing justice, sua sponte, raised the issue of ineffective assistance of counsel and proceeded to rule on it saying, "I could stop right there, but I shall not, because there is more to be said that supports the denial of the [application]. The [applicant] was represented by able, experienced counsel * * *. In sum, there is no place in this case for a claim of ineffective assistance of counsel."

- 6 -

postconviction relief was formally entered on September 21, 2011.  The applicant filed a timely appeal with this Court.[9]

## II

### Standard of Review

Pursuant to G.L. 1956 § 10-9.1-1, a person may file an application for postconviction relief if he or she contends that "the conviction violated [his or her] constitutional rights or that newly discovered facts require vacation of the conviction in the interest of justice."  Bleau v. Wall, 808 A.2d 637, 641 (R.I. 2002) (quoting Powers v. State, 734 A.2d 508, 513-14 (R.I. 1999)).  A postconviction-relief proceeding is civil in nature, and the burden of proof lies with the applicant to show by a preponderance of the evidence that relief should be granted.  Lyons v. State, 43 A.3d 62, 64-65 (R.I. 2012) (citing Brown v. State, 32 A.3d 901, 907 (R.I. 2011)).  In applications for postconviction relief based on newly discovered evidence, we use the same standard of review as in a motion for new trial based on newly discovered evidence.  Brennan v. Vose, 764 A.2d 168, 173 (R.I. 2001) (citing McMaugh v. State, 612 A.2d 725, 731 (R.I. 1992)).  This standard is a two-pronged test; to satisfy the threshold prong the evidence must be (1) newly discovered and not available at the time of trial; (2) it must not have been discoverable by due diligence; (3) it must be material, not simply cumulative or impeaching; and (4) it must be of the type that would likely change the verdict at trial.  Id.  If the evidence meets the four-part threshold prong, it then must meet the second prong, which is an assessment of whether it is "credible enough to warrant relief."  Ferrell v. Wall, 889 A.2d 177, 184 (R.I. 2005) (quoting

---

[9]  During the pendency of his appeal, applicant made a motion for a limited remand to the Superior Court to litigate claims that the state violated applicant's constitutional rights by failure to disclose evidence because, "[t]he appeal now before this Court concerns a claim of newly discovered evidence, and does not raise any constitutional claims."  On September 12, 2013, we denied that motion.

Fontaine v. State, 602 A.2d 521, 524 (R.I. 1992)).  This Court will not overturn a trial justice's findings regarding an application for postconviction relief absent clear error or a determination by this Court that the trial justice neglected or misconceived material evidence.  Reise v. State, 913 A.2d 1052, 1055 (R.I. 2007) (citing State v. Thomas, 794 A.2d 990, 993 (R.I. 2002)).

## III

### Discussion

On appeal, applicant advances three arguments.  First, applicant contends the hearing justice clearly erred when he ruled that the newly discovered evidence was not material and would not change the verdict at trial.  Second, he alleges the court further erred by raising and denying, sua sponte, a claim of ineffective assistance of counsel.  Third, applicant argues that his right to due process was violated when the state withheld evidence from the defense in violation of applicant's constitutional rights as set forth in Brady v. Maryland, 373 U.S. 83, 87 (1963). See also State v. Nickerson, 94 A.3d 1116, 1125 (R.I. 2014); DeCiantis v. State, 24 A.3d 557, 570 (R.I. 2011); State v. Chalk, 816 A.2d 413, 419 (R.I. 2002) (noting that this Court, "provides even greater protection to criminal defendants than the one articulated [by the United States Supreme Court]").  We conclude that the first argument is without merit and that the second and third arguments are not properly before this Court because they were not raised in the postconviction-relief proceedings below.  We will address each argument in detail.

### A. Newly Discovered Evidence

The applicant claims that the newly discovered evidence, namely Dr. Callery's testimony, demands the vacating of his conviction for second-degree murder and the granting of a new trial.

Specifically, D'Alessio contends that, in the absence of Dr. Callery's testimony at trial, he was deprived of the right to a fair trial and a verdict that is worthy of confidence.

At the hearing, there was no serious dispute that this evidence cleared the hurdle of being newly discovered. The hearing justice assumed that applicant had been diligent in his search for evidence before his 2002 trial. However, the hearing justice found that the evidence was not material and that it would "in no way have altered" the verdict. We conclude that the hearing justice's determination was not clearly erroneous.

When he determines the weight of newly discovered evidence, a hearing justice must decide whether the evidence is material and not simply cumulative or impeaching. Brennan, 764 A.2d at 173. Cumulative evidence is that which tends to prove the same point as that of the other evidence offered. State v. Lynch, 854 A.2d 1022, 1032 (R.I. 2004). Impeaching evidence, on the other hand, is "information that is not related to [the] defendant's guilt or innocence and serves only to destroy the credibility of the [witness]." Bleau, 808 A.2d at 644. In short, material evidence is that which creates a "reasonable probability of a different result." Id. at 643 (quoting Powers v. State, 734 A.2d 508, 514 (R.I. 1999)). The question is whether, without the proffered evidence, the defendant received a fair trial resulting in a "verdict worthy of confidence." Kyles v. Whitley, 514 U.S. 419, 434 (1995). In order to undermine the confidence in the verdict, there must exist a nexus between the new evidence and the outcome of the trial. Bleau, 808 A.2d at 644.

In our opinion, Dr. Callery's testimony was not material, as this Court has defined that term.[10] Taken as a whole, the testimony is not of the type that would undermine the confidence

---

[10] While Dr. Callery's testimony was not ultimately material, we question if it was, as the state argues, simply cumulative or impeaching. It is applicant's argument that, had he testified at trial, Dr. Callery would have testified that he was not able to arrive at a conclusion on the file.

in the verdict.  See Brennan, 764 A.2d at 173.  Even if we were to characterize Dr. Callery's

testimony as probative on D'Alessio's guilt or innocence and not simply as undermining Dr.

Laposata's credibility, it was nevertheless of such a vague and indefinite nature that it could not

create a "reasonable probability of a different result."  Bleau, 808 A.2d at 643 (quoting Powers,

734 A.2d at 514).  Indeed, when asked to state a conclusion, Dr. Callery would only say that it

was "[b]etween homicide and undetermined."  Doctor Callery acknowledged that his testimony

was based on his review of a file that was not yet complete, before the neuropathology reports

were conducted, and that, "[i]f new material had been generated and different things happened

afterwards that allowed somebody else to [form the opinion Gianna's death was caused by

homicide]," then he would not disagree with that conclusion.[11]

In addition, the newly discovered evidence must be likely to change the verdict at a new

trial.  Brennan, 764 A.2d at 173.  For the reasons stated above, the hearing justice found that the

testimony of Dr. Callery, when considered alongside the state's evidence, was not of a type that

would likely change the verdict at a new trial.  The trial justice found Dr. Laposata's testimony to

be credible.  In our review, we agree that Dr. Laposata was compelling and note that she had

consulted with an outside neuropathologist before she testified.  In concluding that a trial

Conversely, in her testimony, Dr. Laposata was sure of her opinion.  These differing points are
the key quality of noncumulative testimony.  State v. Lynch, 854 A.2d 1022, 1032 (R.I. 2004).
Nor is Dr. Callery's testimony merely impeaching, because he testified that in his experience,
"[t]he symptomatolgy [sic] and the infliction of trauma do not have to be simultaneous."  Given
applicant's sole custody of the infant prior to her death, the timing between the injury and death
directly relates to applicant's guilt or innocence.  Doctor Callery's testimony was therefore not
merely impeaching because it contradicted Dr. Laposata factually; it did not simply undermine
her credibility.  Bleau v. Wall, 808 A.2d 637, 644 (R.I. 2002).

[11]  It is noteworthy that in an earlier affidavit, Dr. Callery swore that he had reviewed the
neuropathology report.  Cross-examination revealed, however, that that report had not been
completed until after Dr. Callery had completed his review of the file.  Therefore, he could not
have reviewed it.

conducted with the testimony of Dr. Callery would not likely have resulted in a different outcome, the hearing justice was neither clearly erroneous nor did he misconceive the evidence.

When he ruled on the credibility of Dr. Callery's testimony, the trial justice said he was, "well satisfied that Dr. Callery's testimony lacks substantial weight and credibility." However, because it is our opinion that the testimony failed to overcome the threshold prong of the newly discovered evidence analysis, we need not, and will not, address this issue.[12] Although this Court's analysis is not identical to the hearing justice's, we reach the same conclusion; we agree that the testimony of Dr. Callery did not warrant postconviction relief.

### B. Ineffective Assistance of Counsel

The applicant argues that the hearing justice incorrectly, and sua sponte, passed on the issue of ineffective assistance of applicant's trial counsel even though the issue was not raised by either applicant or the state at the hearing. We agree; this Court has noted "[i]n short, 'a party should not be granted relief that it did not request.'" Nye v. Brousseau, 992 A.2d 1002, 1011 (R.I. 2010) (quoting Providence Journal Co. v. Convention Center Authority, 824 A.2d 1246, 1248 (R.I. 2003)). When the hearing justice said, "[i]n sum, there is no place in this case for a claim of ineffective assistance of counsel," there was no such claim before him. Because neither party addressed the competency of applicant's trial counsel, it is our opinion that the hearing justice should have refrained from addressing it. Consequently, we see no reason to review it.[13]

---

[12] At the hearing, the justice did go on to offer his thoughts on the evidence's credibility, but since this Court agrees the evidence is not material, our analysis need not reach the correctness of the justice's findings on Dr. Callery's credibility. See Fontaine v. State, 602 A.2d 521, 524 (R.I. 1992) (once the threshold prong "is satisfied, the trial justice must then determine whether the evidence presented is credible enough to warrant relief"); see also McMaugh v. State, 612 A.2d 725, 732-33 (R.I. 1992) (reviewing the trial justice's credibility finding only because the threshold prong was satisfied).

[13] We note such a claim would need to meet a high bar in the event a subsequent post-conviction relief application is filed. See G.L. 1956 § 10-9.1-8 (stating that claims not raised in the first

## C. <u>Brady</u> Compliance

The applicant also argues that information regarding Dr. Callery's work on the D'Alessio autopsy file constituted exculpatory evidence that was not presented to the defense, a violation of the due-process guarantees of the United States and Rhode Island Constitutions. It is well settled that it is a violation of a criminal defendant's right to due process when the prosecution suppresses favorable evidence material to the defendant's guilt or innocence. <u>Brady</u>, 373 U.S. at 87; <u>see</u> <u>also</u> <u>Chalk</u>, 816 A.2d at 417-18 (acknowledging <u>Brady</u>'s application and its implication of both the United States and Rhode Island Constitutions). The obligations under <u>Brady</u> have been expanded to impose a duty on the prosecutor to learn of any favorable evidence "known to the others acting on the government's behalf," whether or not requested by the defense. <u>Kyles</u>, 514 U.S. at 437; <u>Chalk</u>, 816 A.2d at 418.

However, the time-honored "raise-or-waive" rule that this Court employs imposes upon litigants a duty to raise all their claims for relief in the trial court and properly articulate them to a judge for a ruling. <u>State v. Bido</u>, 941 A.2d 822, 828 (R.I. 2008). There is a narrow exception to this rule, but "the alleged error must be more than harmless, and the exception must implicate an issue of constitutional dimension derived from a novel rule of law that could not reasonably have been known to counsel at the time of trial." <u>State v. Bouffard</u>, 945 A.2d 305, 312 (R.I. 2008) (quoting <u>State v. Breen</u>, 767 A.2d 50, 57 (R.I. 2001)). The bedrock principles of criminal discovery espoused in <u>Brady</u> and its progeny are hardly new; they have been crafted, considered, and limned by our nation's courts for fifty years.

---

instance "may not be the basis for a subsequent application, unless the court finds that in the interest of justice the applicant should be permitted to assert such a ground").

The applicant points to vague and scattered references in the hearing transcript that he urges constitute a Brady claim. We do not agree.[14] The applicant did not articulate a Brady claim in any cogent manner in his application or at the postconviction-relief hearing, and the hearing justice did not rule on any such claim. "[A] motion upon which a trial justice has not ruled presents no question for review by this Court." Bido, 941 A.2d at 829 (quoting State v. Abreu, 899 A.2d 473, 476 (R.I. 2006)). Lastly, the applicant's argument on appeal invokes no novel rule of law that would have been unknown in the year 2000 to the trial counsel, or in 2007 to the applicant's attorneys on postconviction relief. Accordingly, the issue of a possible violation of due process was not properly raised below, fails to meet the stricture of our narrow exception, and we consider it to have been waived.

---

[14] Notably applicant did not litigate the Brady issue during the three-day hearing on postconviction relief. On appeal, he points to nebulous statements in the record, including factual allegations that Dr. Laposata "deprived the [d]efendant of the exculpatory evidence," when she did not inform the state of Dr. Callery. Not only does this not touch on the prosecution's conduct, which Brady addresses, but applicant did not present it clearly as a Brady claim. The other references cited in applicant's briefs are similarly unconvincing. Brady was not raised in such a manner that the hearing justice should have known that he was required to rule on it. Indeed, this Court previously addressed the Brady issue when it denied applicant's motion for a remand because, as applicant stated, "[t]he appeal now before this Court concerns a claim of newly discovered evidence, and does not directly raise any constitutional claims." While we decline to analyze the Brady claim in detail, we note that the merits appear lacking. The applicant's attorney conceded that the Attorney General did not possess the information that Dr. Callery had worked on the file, saying at the hearing, "no one knew Dr. Callery existed; not even the Attorney General's Office." Moreover, this Court has never held that information in the possession of the Office of State Medical Examiners is within the scope of the prosecutor's duty to disclose.

# IV

## Conclusion

For the reasons set forth above, the judgment of the Superior Court is affirmed and the record may be remanded thereto.



# RHODE ISLAND SUPREME COURT CLERK'S OFFICE

## *Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**       Rocco D'Alessio v. State of Rhode Island.

**CASE NO:**             No. 2011-389-Appeal.
(PM 07-2755)

**COURT:**               Supreme Court

**DATE OPINION FILED:**  November 18, 2014

**JUSTICES:**            Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**          Associate Justice Francis X. Flaherty

**SOURCE OF APPEAL:**    Providence County Superior Court

**JUDGE FROM LOWER COURT**:

                         Associate Justice Robert D. Krause

**ATTORNEYS ON APPEAL:**

                         For Applicant:  Kara J. Maguire
                                             Office of the Public Defender

                         For State:  Lauren S. Zurier
                                         Department of Attorney General